# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| BILL A. BUSBICE, JR., an individual; OLLAWOOD PRODUCTIONS, LLC, a limited liability company; and ECIBSUB, LLC, a limited liability company | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 1:17-CV-1640 |
| ADRIAN VUCKOVICH, an individual; COLLINS, BARGIONE & VUCKOVICH, a partnership; and DOES 1-50, inclusive | ) ) ) ) | Honorable Andrea R. Wood  Magistrate Judge Maria Valdez |
| Defendants | ) ) ) ) | |

**Report of John M. Breen**

## I. Curriculum Vitae

My curriculum vitae is attached hereto as Exhibit A. Briefly put, I received my B.A. from the University of Notre Dame in 1985 and my J.D. from Harvard Law School in 1988. After graduating from law school, I clerked for Hon. Boyce F. Martin, Jr., a judge on the U.S. Court of Appeals for the Sixth Circuit. I then worked at Sidley & Austin as a litigation associate from 1989-1994. I left private practice to work as a law professor in 1994, teaching for two years at Detroit College of Law, and since 1996 at Loyola University Chicago School of Law. Every year that I have served as a law professor I have taught at least one course in legal ethics. From 2000-2003 I served as

1

the Reporter to the Illinois Supreme Court Committee on Professional Responsibility. From 1999-2004 I was one of the primary contributors to the Illinois portion of the American Legal Ethics Library, an online summary of the legal ethics for all fifty states hosted by Cornell Law School's Legal Information Institute.

## II. **Materials Relied Upon**

The opinions and conclusions set forth in this Report are based upon my review of the following: (1) the Second Amended Complaint (hereinafter "SAC") filed in this case (attached hereto as Exhibit B); (2) the deposition in this case of Adrian Vuckovich with exhibits; (3) the deposition in this case of Bridget Atherton with exhibits; (4) additional documents obtained through discovery in this case but not used as exhibits in depositions (attached hereto as Exhibits C and D); (5) charts provided by plaintiffs' forensic accounting expert, Joan Martin, which are all attached to Ms. Martin's expert report. Attached at the end of this Report as an Appendix is a list of all the documents in this case that I have relied upon. Moreover, these opinions and conclusions are also based on my legal knowledge and experience, including my knowledge of the Illinois Rules of Professional Conduct and the law governing lawyers.

I reserve the right to change, amend, and/or supplement any of my opinions set forth in this Report, as I deem necessary, in response to new information or evidence made available to me, additional analysis that leads me to conclude that supplementation is necessary, and new issues that may arise, as well as any additional discovery, arguments, evidence, or testimony presented in this case. I expect to respond and provide additional evidence or testimony (whether during my deposition, at trial, or otherwise as

2

appropriate) in response to assertions made by the defendants, or by their experts in any reports or testimony given in this case.

I am being compensated for my services with respect to this matter at a rate of $600.00 an hour. My compensation is in no way dependent on the outcome of the case. If called at trial, I expect to explain the opinions and analysis described in this Report. I reserve the right to use demonstratives at trial in support of my testimony.

### III. Summary of the Relevant Facts

On May 28, 2014, plaintiffs Bill Busbice, Jr. ("Busbice"), Ollawood Productions, LLC ("Ollawood"), and Ecibsub, LLC ("Ecibsub"), filed an action against defendants James David Williams ("Williams"), Steven J. Brown ("Brown"), Gerald R. Seppala ("Seppala"), Luxe One, Inc. ("Luxe One"), Moment Factory, LLC ("Moment Factory"), Visions LLC ("Visions"), Legacy Film Crest, LLC ("Legacy"), Bipartisan Coalition for American Security Corporation ("Bipartisan"), Highgate Pass, LLC ("Highgate"), Garuda Partners, Ltd., as Trustee for the Mulholland Ridge Trust ("Garuda") in U.S. District Court for the Central District of California. The case, *Busbice, et al. vs. Williams, et al.* (Case No. CV 14-4077 PA (AJWx)) (hereinafter the "*Williams* Complaint"), was subsequently consolidated with another matter, *Busbice et al. vs. Reiss* (Case No. CV 14-7063 PA (AJWx)) brought by the same plaintiffs against Barry J. Reiss ("Reiss") (hereinafter the "*Reiss* Complaint"). The consolidated case (hereinafter referred to as "*Busbice I*") was settled by all parties on July 30, 2015. In addition to this, the plaintiffs also reached an out-of-court settlement with Stuart Manashil ("Manashil")

without the need of filing suit.[1] According to the terms of the *Busbice I* settlement (p. 10), Luxe One transferred and assigned to Ollawood "any and all claims, suits, causes of action, contract rights, intellectual property rights, insurance claims, tax refunds or rebates and /or any other enforcement rights and recoveries now or in the future by, for the account of or for the direct or indirect benefit of Luxe One." This provision forms the legal predicate for the present lawsuit in which Mr. Busbice, Ollawood, and Ecibsub are suing Adrian Vuckovich and the law firm Collins, Bargione & Vuckovich for civil conspiracy, aiding and abetting, imposition of a constructive trust, negligence, and breach of fiduciary duty.

Adrian Vuckovich ("Vuckovich") is a lawyer licensed to practice law in Illinois and a partner in the firm of Collins, Bargione & Vuckovich (hereinafter "CB&V" or the "CB&V law firm") where he has practiced law for twenty-six years (AV Dep. at 13-16). Mr. Vuckovich considers himself an expert in the field of legal ethics (AV Dep. at 15-17).

Luxe One, Inc. ("Luxe One") is a California corporation with its principal place of business in Los Angeles (SAC ¶ 29) (attached hereto as Exhibit B). The purported purpose of this company was to provide funding with respect to the production, promotion, and distribution of a feature motion picture known as "The Letters" (AV Dep. Ex. 37).

For purposes of this opinion, I shall assume that the allegations concerning the fraudulent scheme and conspiracy set forth in the SAC, in which Mr. Brown, Mr.

---

[1] Although Mr. Manashil was not formally named as a defendant, Mr. Vuckovich represented Mr. Manashil in settlement negotiations with respect to the allegations set forth in the *Busbice I* lawsuit (Deposition of Adrian Vuckovich, taken on November 30, 2017 and December 1, 2017 (hereinafter "AV Dep.") at 32).

Williams, and the other *Busbice I* defendants and Mr. Manashil, induced Mr. Busbice to invest millions of dollars in the purported production and marketing of four feature-length films, are true. As set forth in the SAC, these four feature film projects were entitled "Made in America," "The Letters," "Angels Sing," and "Left Behind" (SAC ¶ 2). In each instance, the plaintiffs "were told that investing in each deal would bring a guaranteed return of capital, interest, and lucrative profit participation rights" (*Id.*). In each case, "[o]ne or more of the co-conspirators falsely represented that they had already invested millions of their own money in each film," that other investors were involved in these projects, and that the plaintiffs "could take advantage of the lucrative deal by investing their own money" (*Id.*). To reap the benefits of this scam, "the co-conspirators set up and controlled a network of bank accounts and shell companies in Los Angeles – and used falsified monthly bank statements from those accounts – to induce Plaintiffs to transfer money to the co-conspirators" (*Id.* ¶ 3). After securing Mr. Busbice's wire transfer of funds to the accounts of the purported investment entities for each of the film projects, "the co-conspirators transferred or deposited hundreds of thousands of dollars . . . into CBV's client trust account in Chicago" (*Id.* ¶ 4). Mr. Vuckovich or others at the CB&V law firm then either returned these funds to the co-conspirators or otherwise disbursed them at the direction of the co-conspirators. In doing so, Mr. Vuckovich and CB&V used their trust accounts to conceal the fraud with a façade of legitimacy "cloaked behind a purported attorney-client relationship and privilege" (*Id.* ¶ 5). Mr. Vuckovich and the CB&V law firm were enriched for their participation in this scheme (*Id.*).

Luxe One was a client of Mr. Vuckovich's and the CB&V law firm. Mr. Vuckovich represented Luxe One with respect to the *Busbice I* lawsuit beginning in June

2014. At the start of the suit Mr. Vuckovich made arrangements for the acceptance of service on behalf of Luxe One and the other defendants named in the *Williams* Complaint (AV Dep. at 122-123, Ex. 33). Mr. Vuckovich's legal representation in the case included coordinating with the various individual defendants and entities named as defendants in *Busbice I* and formulating a settlement position (AV Dep. Ex. 35). Mr. Vuckovich's billing records indicate that even after he stepped back from the litigation, he continued to bill time to the matter, sending an invoice to Mr. Williams in February 2015 for work performed in January 2015 (AV Dep. 156-158 and Ex. 40).

Mr. Vuckovich also represented Luxe One in an arbitration against Big Screen Partners V, Ltd. beginning in June 2014 (AV Dep. at 97-98, 152-154; Ex. 30, 37). Mr. Vuckovich filed the initial demand for arbitration with the American Arbitration Association ("AAA"), but his demand was subsequently dismissed for lack of a filing fee (AV Dep. at 128-130, 150-155; Ex. 35, 37, 38). Mr. Vuckovich filed the demand for arbitration without understanding the ownership structure of Luxe One, but by simply assuming that Mr. Williams had authority to approve the Luxe One arbitration (AV Dep. at 155). On the same day that Mr. Vuckovich filed his ill-fated arbitration demand, June 17, 2014, Big Screen Partners V, Ltd. filed its demand for arbitration with the AAA, which Mr. Vuckovich received the following day (Vuckovich 000843-000854).[2] In the arbitration demand, Big Screen alleged that Luxe One had engaged in breach of contract and fraud, including the misappropriation of Luxe One funds for Mr. Williams' personal use. Mr. Vuckovich continued to bill time to the Luxe One arbitration matter involving Big Screen through July 2014 (AV Dep. Ex. 38). On September 17, 2014, Mr.

---

[2] Any document produced by Vuckovich and/or CB&V and not cited as a deposition exhibit, but cited and relied upon in this Report, is attached hereto as Exhibit C.

6

Vuckovich eventually handed off the representation of Luxe One in the Big Screen arbitration to Mr. John Burgee (Vuckovich Nos. 000222-000223). Mr. Vuckovich's representation of Luxe One may have continued after this point as Mr. Vuckovich informed Mr. Burgee that, going forward, he was "happy to help in any way that I can" (*Id.*).

Luxe One features prominently in the fraudulent scheme and conspiracy that is at the heart of *Busbice I* and the present lawsuit (*See* AV Dep. Ex. 26 and SAC ¶¶ 28-31, 35-38, 45-50). This fraudulent scheme and conspiracy worked to convert funds that Mr. Busbice had intended for investment purposes, and to enrich the defendants and their fellow co-conspirators. The materials that I have reviewed show that Mr. Vuckovich and the CB&V law firm handled a number of items that indicated on their face that they were from Luxe One, or that can be directly traced to Luxe One bank accounts. Mr. Vuckovich and the CB&V law firm received these items, deposited them in their accounts, and distributed the funds represented by these items as directed by Mr. Brown. (*See, e.g.,* AV Dep. Ex. 122, 124, Vuckovich 000037, 000962, 000963, 000966, 000967).

Mr. Vuckovich did this not only following his receipt of the allegations of the *Williams* Complaint filed in *Busbice I*, and the demand for arbitration filed by Big Screen Partners V, Ltd. He also did this following his receipt of a July 3, 2014 letter from David Steinberg (AV Dep. Ex. 28), an attorney at Dentons Canada LLP representing Left Behind Investments, LLC, the producer of the motion picture, "Left Behind," one of the films into which Mr. Busbice had been induced to invest through the *Busbice I* defendants. In this July 3, 2014 letter, addressed to Mr. Williams, Mr. Steinberg refers to "numerous breaches and other significant instances of illegal behavior and wrongdoing to

justify your removal in all respects from this project." (*Id.*). Significantly, some of the allegations of wrongdoing set forth in the Dentons letter involve Luxe One.

## IV. **Summary of the Applicable Legal Standards**

In order for a plaintiff to recover damages in a lawsuit alleging legal malpractice against his or her former lawyer, the plaintiff must show that the lawyer owed a duty to the client, that the lawyer breached this duty by failing to meet the standard of care, and that this breach caused injury to the client. Similarly, in order for a plaintiff to recover damages in a lawsuit for breach of fiduciary duty, the plaintiff must show that the defendant owed the plaintiff a fiduciary duty, that the duty was breached, and that the breach proximately caused the injury for which the plaintiff seeks redress. In Illinois, a fiduciary duty is present as a matter of law where an attorney-client relationship exists. As a fiduciary, a lawyer is obliged to act for the benefit of his or her client in good faith, and with loyalty, honesty, and diligence.

Every lawyer licensed to practice law in the State of Illinois is subject to the Illinois Rules of Professional Conduct (the "Illinois Rules" or the "IRPC"). The IRPC are not in and of themselves a source of civil liability, but Illinois courts often consider the IRPC as persuasive authority in determining the relevant standard of care in cases alleging legal malpractice and breach of fiduciary duty.

In 1990 the Illinois Supreme Court adopted the IRPC, modeled after the American Bar Association's Model Rules of Professional Conduct (the "ABA Model Rules").[3] In 2009 the Illinois Supreme Court adopted a revised IRPC based upon a

---

[3] The IRPC replaced the Illinois Code of Professional Responsibility (the "Illinois Code" or the "ICPC"). This earlier set of rules was likewise based on the American Bar Association's Model Code of Professional Responsibility (the "ABA Model Code").

revision of the ABA Model Rules promulgated by the American Bar Association. This revised set of rules became effective in January 2010. The two versions of the IRPC – the 1990 version and the 2010 version – differ in a number of details but are substantially similar. One major difference between the two sets of rules is that in adopting the revised IRPC, the Supreme Court also adopted a set of explanatory comments to aid lawyers in their interpretation of the rules. The original IRPC from 1990 had no such comments. However, in interpreting the earlier version of the IRPC, courts in Illinois often made use of the comments accompanying the ABA Model Rules.

To properly assess whether Mr. Vuckovich and the CB&V law firm met the standard of care and satisfied their fiduciary obligations in their representation of Luxe One, the IRPC are persuasive authority. My conclusions and opinions are limited to an evaluation of Mr. Vuckovich's and the CB&V law firm's conduct as attorneys under the IRPC and the law governing Illinois attorneys.

## V. <u>Conclusions and Opinions</u>

### A. Because Mr. Vuckovich and the CB&V Law Firm Had Actual Knowledge of the Fraudulent Scheme to Defraud Mr. Busbice, They Failed to Satisfy the Duty of Care and the Fiduciary Duties They Owed to Their Client, Luxe One

I have been asked to opine on the conduct of Mr. Vuckovich and the CB&V law firm with respect to the duty of care and the fiduciary duties that they owed to their client, Luxe One, whom they represented from June 2014 to at least September 2014. For purposes of this portion of my Report, I have assumed that the allegations set forth in Plaintiffs' Second Amended Complaint concerning Mr. Vuckovich's and the CB&V law firm's actual knowledge of the fraud perpetuated by the *Busbice I* defendants and Mr. Manashil on Mr. Busbice and his companies, Ollawood Productions and Ecibsub, are

9

true. I note, in this regard, that although the present lawsuit began in November 2015, and that an initial and two amended complaints have been filed, and that discovery is now closing, the defendants have yet to file an answer in the case. Indeed, I have formulated the opinions set forth in this part of my Report with the confident expectation that the trier of fact in the instant case will find that Mr. Vuckovich and the CB&V law firm had actual knowledge of the fraud and conspiracy alleged in this lawsuit.

With this assumption in mind, based upon my knowledge of the Illinois Rules of Professional Conduct and the other law governing Illinois attorneys, it is my professional opinion that Mr. Vuckovich and the CB&V law firm violated the duty of care and the fiduciary duties that they owed to their client, Luxe One.

Rule 1.2(d) of the IRPC provides in pertinent part that "[a] lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent." IRPC 1.2(d) contains a number of exceptions to this general prohibition, none of which appear to apply in this case.[4] Rule 1.0(f) of the IRPC provides that a lawyer "knows" something when he or she has "actual knowledge of the fact in question," but further provides that "[a] person's knowledge may be inferred from the circumstances."

---

[4] That is, IRPC 1.2(d) allows a lawyer to "discuss the legal consequences of any proposed course of conduct with a client," to "counsel or assist a client to make a good-faith effort to determine the validity, scope, meaning or application of the law," and to "counsel or assist a client in conduct expressly permitted by Illinois law that may violate or conflict with federal or other law." There is no evidence in the materials that I have reviewed that Mr. Vuckovich or anyone at the CB&V law firm consulted Mr. Brown, Mr. Williams, or any of the other defendants in *Busbice I* about the consequences or legality of the fraudulent scheme in which they induced Mr. Busbice to invest millions of dollars in the purported production and marketing of feature films.

Similarly, Rule 8.4 of the IRPC provides that it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects"; to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation"; and to "engage in conduct that is prejudicial to the administration of justice."

The failure of Mr. Vuckovich and the CB&V law firm to satisfy these standards in their representation of Luxe One was egregious. This is all the more remarkable given that Mr. Vuckovich considers himself to be an expert in the field of legal ethics (AV Dep. at 15-17). It is a fundamental professional obligation of every attorney to uphold the rule of law. Every attorney is duty bound to counsel and encourage his or her clients to comply with the law and to discourage client actions that would constitute a crime or a fraud. Moreover, whenever a client proposes some conduct that is illegal or fraudulent in nature for which the client seeks the lawyer's assistance, the lawyer must steadfastly decline. As the comments following Rule 1.2(d) make plain, the lawyer "must avoid assisting the client" by advancing the wrongful conduct, or "by suggesting how the wrongdoing might be concealed." IRPC 1.2, cmt. 11.

The fraudulent scheme and conspiracy set forth in *Busbice I* and in the Second Amended Complaint in the instant case are paradigmatic of the fraudulent and illegal activity contemplated by Rules 1.2(d) and 8.4. It is absolutely impermissible for any lawyer to knowingly take part in such an illegal venture. The heart of the fraudulent scheme and conspiracy described above is the subject of a federal criminal investigation and a series of indictments and other documents alleging wire fraud, conspiracy to commit wire fraud, and money laundering (*See, e.g.,* AV Dep. Ex. 15, Ex. 16). Indeed,

11

Mr. Williams has already pled guilty to this scheme (AV Dep. Ex. 17 and Ex. 18) and Mr. Brown stands at risk of legal jeopardy, facing the possibility of imprisonment for many years (*See, e.g., U.S. v. Steven Brown* (Superseding Indictment, U.S. Dist. Ct. S.D.N.Y., No. S6 16 Cr. 436, Dec. 7, 2017). Moreover, it is my understanding that the law firm referred to the original indictment and subsequent indictments concerning this scheme is the CB&V law firm.[5]

Because Mr. Vuckovich and the CB&V law firm had knowledge of this fraudulent scheme, neither Mr. Vuckovich nor his law firm could participate in the transactions that furthered the scheme and aided in its concealment. In satisfying the standard of care that he owed to his client, Luxe One, Mr. Vuckovich could not receive fraudulently obtained monies, deposit those monies in his trust accounts, and then disbursed those monies for the benefit of his fellow co-conspirators. As an attorney who owed fiduciary duties to his client, Luxe One, Mr. Vuckovich could not take possession of monies from Luxe One (who obtained those monies fraudulently from Mr. Busbice) and conceal the origin and whereabouts of those funds under the ostensible cloak of legitimacy provided by the use his lawyer trust accounts.

The law that governs the conduct of Illinois attorneys required Mr. Vuckovich and the CB&V law firm to act in a very different manner from the way in which they conducted themselves. That is, to fulfill both the standard of care that they owed to Luxe

---

[5] Remarkably, Mr. Vuckovich claims that in reading the original indictment filed against Mr. Williams, Mr. Brown, and Mr. Seppala in U.S. District Court for the Southern District of New York (AV Dep. Ex. 15), he did not understand "Victim-1" to refer to Mr. Busbice (AV Dep. at 40-41). He also claims not to understand that the law firm referred to in paragraph 16 of the original indictment refers to the CB&V law firm (AV Dep. at 41-42).

One as its counsel, as well as the fiduciary obligations they owed to their client, Mr. Vuckovich and the CB&V law firm were required to adopt a very different course of action than the one they pursued.

First, certain special duties were incumbent upon Mr. Vuckovich and the CB&V law firm because their client, Luxe One, is a corporation, that is, an organizational client. IRPC 1.13(a) makes clear that a lawyer for an organizational client (such as a corporation) represents the entity itself, and not the individuals who own the entity or those work on its behalf (e.g. shareholders, officers, directors, and employees). Nevertheless, the lawyer must work through these individuals in advancing the interests of his or her client, that is, the entity. Thus, IRPC 1.13(a) provides that "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." It may, however, be the case, that a constituent for the organization is acting in a way that is harmful to the organization's interests. IRPC 1.13(b) addresses this situation. It provides:

> If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a crime, fraud or other violation of law that reasonably might be imputed to the organization, and that is likely to result in substantial injury to the organization, then the lawyer shall proceed as is reasonably necessary in the best interest of the organization. Unless the lawyer reasonably believes that it is not necessary in the best interest of the organization to do so, the lawyer shall refer the matter to higher authority in the organization, including, if warranted by the circumstances, to the highest authority that can act on behalf of the organization as determined by applicable law.

Under the assumption operative in this portion of the Report, under IRPC 1.13, Mr. Vuckovich knew that Mr. Brown was engaged in "a violation of a legal obligation to the

organization," that is, Mr. Brown's fiduciary obligation to Luxe One. Mr. Vuckovich also knew that this violation of Mr. Brown's fiduciary duty was "likely to result in substantial injury to the organization." That is, he knew that Mr. Brown was using the assets of Luxe One for Mr. Brown's personal benefit, and that this was harmful to Luxe One whose monies were to be devoted to the production and marketing of the film "The Letters."

Similarly, under the assumption operative in this portion of the Report, Mr. Vuckovich knew that Mr. Brown was engaged in "a crime, fraud, or other violation of law that reasonably might be imputed to the organization" and that these actions were "likely to result in substantial injury to the organization." That is, Mr. Vuckovich knew that Mr. Brown was engaged in wire fraud, conspiracy to commit wire fraud, and money laundering, and that these wrongful acts could be imputed to Luxe One.

With this knowledge in hand, Mr. Vuckovich should have proceeded as was "reasonably necessary in the best interest of the organization." This ethical duty required Mr. Vuckovich to share this information with "the highest authority that can act on behalf of the organization." Under the circumstances, this "highest authority" was the board of directors of Luxe One, Inc. It is my understanding that, during the time in question, Mr. Busbice, through his company Olla Productions, LLC (now Ollawood Productions, LLC), was one of Luxe One's three shareholders, and that Mr. Busbice served on Luxe One's board of directors.

Mr. Vuckovich failed to act in accordance with the standards set forth in IRPC 1.13. He failed to act in the best interests of Luxe One. On the contrary, he acted in accord with the wishes of Mr. Brown and his fellow co-conspirators. Mr. Vuckovich

14

continued to participate in the fraudulent scheme and conspiracy that converted the monies Mr. Busbice had invested in Luxe One, for the use and enjoyment of Mr. Vuckovich, the CB&V law firm and their fellow co-conspirators.

Second, Rule 1.4 of the IRPC sets forth an attorney's ethical duty to communicate with his or her client. IRPC 1.4(a)(5) provides that a lawyer should "consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law." Indeed, such a consultation is already anticipated by the comments that accompany Rule 1.2(d).[6] As Rules 1.2(d) and 8.4 and other law make clear, an Illinois lawyer is not permitted to participate in a scheme involving wire fraud, conspiracy to commit wire fraud, and money laundering. As Rules 1.2(d) and 8.4 and other law make clear, an Illinois lawyer is not permitted to assist his or her client in the furtherance or concealment of a fraudulent conspiracy to siphon monies off from a legitimate investment and wrongfully direct those monies toward the personal benefit of others.

IRPC 1.4(a)(5) required Mr. Vuckovich to communicate with Mr. Brown concerning Mr. Vuckovich's inability, under the ethics rules and other law, to assist Mr. Brown in the use of Luxe One as a source of fraudulently obtained monies and the laundering of those monies for the benefit of Mr. Brown and others. IRPC 1.4(a)(5) required Mr. Vuckovich to communicate with Mr. Brown concerning Mr. Brown's breach of the fiduciary duties he owed to Luxe One.

---

[6] See IRPC 1.2, cmt. 14 ("If a lawyer comes to know or reasonably should know that a client expects assistance not permitted by the Rules of Professional Conduct or other law or if the lawyer intends to act contrary to the client's instructions, the lawyer must consult with the client regarding the limitations on the lawyer's conduct. See Rule 1.4(a)(5).").

The result of having such a candid conversation with Mr. Brown would have led an honest and competent lawyer to conclude that he could not continue with the representation of Luxe One. IRPC 1.16(a)(1) provides that an attorney must decline the prospective representation of a client or withdraw from a representation that has already begun where "the representation will result in violation of the Rules of Professional Conduct or other law." Rule 1.2(d)(4) already anticipated this outcome. As comment 11 to IRPC 1.2 makes clear, "[a] lawyer may not continue assisting a client in conduct that the lawyer originally supposed was legally proper but then discovers is criminal or fraudulent. The lawyer must, therefore, withdraw from the representation of the client in the matter. *See* Rule 1.16(a)."

As the comment goes on to say, however, "withdrawal alone might be insufficient. It may be necessary for the lawyer to give notice of the fact of withdrawal and to disaffirm any opinion, document, affirmation or the like." IRPC 1.2, cmt. 11. The comment then cites to IRPC 4.1, which provides that, in the course of representing a client, a lawyer shall not knowingly "fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6." Rule 1.6 of the IRPC would not have prohibited Mr. Vuckovich from disclosing the facts of the fraudulent scheme and conspiracy to Mr. Busbice. On the contrary, IRPC 1.6(b) provides that a lawyer "may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary" to prevent the client "from committing a crime," or to prevent or rectify a fraud by the client that has resulted in or is "reasonably certain to result in substantial injury to the financial

interests or property of another and in furtherance of which the client has used or is using the lawyer's services."

Mr. Brown used Mr. Vuckovich's services to substantially injure the financial interests of Luxe One (and thus Mr. Busbice), and under the assumption operative in this portion of the Report, Mr. Vuckovich knowingly employed his services in furtherance of this fraudulent scheme and conspiracy. As per IRPC 1.4, an honest and competent lawyer would have had a candid conversation with Mr. Brown about how he could not, as a matter of professional responsibility, continue with the representation. Since the representation had already begun, as per IRPC 1.16, an honest and competent lawyer would have withdrawn from the representation in order to avoid furthering this fraudulent scheme and conspiracy. More than this, an honest and competent attorney would have had to withdraw from the representation of Luxe One even if Mr. Brown had promised that the fraudulent scheme and conspiracy was all in the past. This is because continued representation would have worked to conceal the fraud that had already taken place. Indeed, as per IRPC 4.1 and 1.6, an honest and competent attorney would have disclosed the facts concerning the fraudulent scheme and conspiracy to Mr. Busbice.

Mr. Vuckovich and the CB&V law firm failed to satisfy all of these duties of professional responsibility and in so doing violated both the standard of care and the fiduciary duties that they owed to Luxe One.

**B.      Because Mr. Vuckovich and the CB&V Law Firm Suffered From a Conflict of Interest, They Failed to Satisfy the Duty of Care and the Fiduciary Duties They Owed to Their Client, Luxe One**

In this portion of the Report, I have not assumed that Mr. Vuckovich and the CB&V law firm had actual knowledge of the fraudulent scheme in which Mr. Brown, Mr. Williams, Mr. Manashil and the other *Busbice I* defendants induced Mr. Busbice to invest millions of dollars in the purported production and marketing of feature films. Even absent this assumption, it is still my professional opinion, based on my knowledge of the Illinois Rules of Professional Conduct and the other law governing Illinois attorneys, that Mr. Vuckovich and the CB&V law firm violated the duty of care and the fiduciary duties that they owed to their client, Luxe One.

Rule 1.7(a) of the IRPC provides that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Rule 1.7(a)(2) further provides that a lawyer suffers from a "concurrent conflict of interest"[7] when "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."

The purpose behind IRPC 1.7(a)(2) is to help safeguard an attorney's loyalty to his or her client and so protect the quality of the representation. Rule 1.7(a)(2) recognizes that it is the fundamental obligation of every attorney to exercise independent professional judgment in the service of his or her client, and to act with zeal and diligence to further the client's interests. A lawyer should not be dissuaded from pursuing those interests out of concern for someone else. As comment 8 to IRPC 1.7 explains, "a

---

[7] In addition, IRPC 1.7(a)(1) provides that a lawyer suffers from a "concurrent conflict of interest" when "the representation of one client will be directly adverse to another client."

conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend, or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests." The concern is that these rival responsibilities and interests will "in effect foreclose[] alternatives" with respect to the attorney's advice and actions "that would otherwise be available to the client." *Id.* In determining whether a lawyer suffers from a material limitation "[t]he critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." *Id.*

Rule 1.7(b) allows for the possibility of avoiding a conflict of interest due to a "material limitation." That is, Rule 1.7(b) provides that even where a lawyer may be "materially limited" due to his or her responsibilities to another client, a former client, a third-party, or the lawyer him-or-herself, the lawyer may go forward with the representation if the lawyer "reasonably believes" that he or she "will be able to provide competent and diligent representation to each affected client" and "each affected client gives informed consent."

With respect to IRPC 1.7(a)(2), Mr. Vuckovich and the CB&V law firm were materially limited in their representation of Luxe One. Mr. Vuckovich placed the interests of his longstanding friend and client, Mr. Brown, ahead of the interests of his corporate client, Luxe One. Moreover, it is also the case that Mr. Vuckovich placed his personal financial interests, and those of his firm, ahead of the interests of his client, Luxe One. As a result, Mr. Vuckovich did not provide Luxe One with the independent

professional judgment to which it was entitled. Mr. Vuckovich was unable to consider, recommend, or carry out a variety of different courses of action in seeking to advance the interests of Luxe One. This material limitation is evident throughout the materials that I have reviewed – in what Mr. Vuckovich did and didn't do when confronted with credible information of illegality and serious impropriety on behalf of Mr. Brown, Mr. Williams and others, from a variety of sources. Furthermore, Mr. Vuckovich made no effort to discern that a conflict of interest was in fact present under IRPC 1.7(a)(2), let alone obtain informed consent from the affected clients under IRPC 1.7(b). Because Mr. Vuckovich and the CB&V law firm suffered from a "material limitation" under IRPC 1.7(a)(2), they failed to comply with the applicable standard of care and their fiduciary obligations in their representation of Luxe One.

Courts often examine the nature and duration of the relationship that a lawyer has with an individual in order to determine if it was the source of a material limitation. Mr. Vuckovich and the CB&V law firm had a longstanding relationship with Mr. Brown. Mr. Vuckovich has known Mr. Brown since the mid-1980s (AV Dep. at 32). Thus, his relationship with Mr. Brown long predates the creation of Luxe One as an entity. Mr. Vuckovich is also friends with Mr. Brown's older brother, Marc (AV Dep. at 32-33). Mr. Vuckovich has represented Steven Brown approximately 10-15 times, and he has represented entities in which Mr. Brown held an interest or was the controlling member or contact person (AV Dep. at 33-34). He also represented Mr. Brown in obtaining a divorce (AV Dep. at 35). As Mr. Vuckovich explained, commenting on their relationship: "We've known each other a long time and we'd talk about different things, and that's just the way it worked" (AV Dep. at 267). By contrast, it is my understanding

20

that Mr. Vuckovich has never met or had a personal or individual relationship with Mr. Busbice, one of three shareholders in Luxe One and the company's sole investor.

During his representation of Luxe One from June to September of 2014, Mr. Vuckovich became aware of serious allegations of wrongdoing leveled against Mr. Brown, Mr. Williams, and other individuals, as well as Luxe One itself and various other companies affiliated with these individuals. Yet, to any reasonable observer, his response was an exercise in studied indifference – an apparently calculated lack of curiosity in the face of claims that any reasonably honest and competent lawyer would have known demanded attention and investigation. In failing to conduct an investigation into these matters and in continuing to follow Mr. Brown's instructions as before with respect to the disbursement of funds received by the CB&V law firm, Mr. Vuckovich and the law firm failed to satisfy the standard of care and violated their fiduciary duties to Luxe One.

Mr. Vuckovich received a copy of the *Williams* Complaint in *Busbice I* shortly after it was filed, sometime in June 2014 (AV Dep. at 83; Ex.26), by June 3, 2014 at the latest (AV Dep. at 84; Ex. 27). He testified that he may have received it from Mr. Brown or Mr. Williams, or perhaps from Mr. Busbice's counsel, Mr. Gale or Mr. Prouty (*Id.*). Mr. Vuckovich's testimony about a time sheet indicates that that he was involved in the case even before the lawsuit was filed (AV Dep. at 114-115 and Ex. 30).

The *Williams* Complaint in *Busbice I* sets forth numerous, detailed allegations concerning "a bold and brazen securities fraud" (AV Dep. Ex. 26 ¶ 1). The 58-page complaint contains 242 paragraphs of substantive allegations prior to setting forth its sixteen prayers for relief. In general it alleges that Mr. Brown, Mr. Williams, Mr. Seppala and others "swindled Plaintiffs out $10,900,00" by "fraudulently induc[ing]

21

Plaintiffs to invest in companies that purported to own and/or control rights to feature length films, including the right to participate in the film's net revenues, and in some instances, the right to finance the film's marketing campaign (so-called 'prints and advertising' or 'P&A' financing) which, in addition to a priority return plus interest, entitled the financing company to receive a substantial interest in the film's net revenues" (AV Dep. Ex. 26 ¶ 2). The complaint further alleges that the arrangement was an enormous confidence scheme perpetrated through the use of falsified documents, and that the co-conspirators "secretly, wrongfully and without Plaintiffs' knowledge, siphoned millions of dollars to other accounts under their exclusive control and converted Plaintiffs' money for their own personal use" and that "almost none of the funds were spent on the film projects or used for the purposes for which they were intended" (AV Dep. Ex. 26 ¶ 5).

Specifically, with respect to Luxe One, the *Williams* Complaint in *Busbice I* alleges that Mr. Williams induced Mr. Busbice to initially invest a total of $6,000,000 in P&A financing and "finishing funds" for a film project entitled "The Letters," a feature film about the life of Mother Theresa. These transactions were premised on the false claims that Mr. Williams had already invested millions of dollars of his own money and that he had arranged for additional investment from other clients (AV Dep. Ex. 26 ¶¶ 36-42, 54-65). The *Williams* Complaint also explained how, when Mr. Busbice obtained true and correct copies of Luxe One's bank account documents, the true nature of the fraud was revealed (AV Dep. Ex. 26 ¶¶ 73-74) including the absence of investments from Mr. Williams and his purported clients. The true bank statements also showed numerous unauthorized transfers of Luxe One funds on personal matters and matters wholly

unrelated to the purported investment in "The Letters," as well as the existence of a secret Luxe One bank account over which Mr. Brown and Mr. Williams had control (AV Dep. Ex. 26 ¶¶ 73-74). With "full access and control" over this account, the complaint alleges that Mr. Brown "essentially treated the account as his own personal piggy bank, freely spending the account's contents over time on unauthorized non-business items" (AV Dep. Ex. 26 ¶ 81).

Mr. Vuckovich acknowledges that he represented the defendants in the *Busbice I* lawsuit, although he downplays the representation saying that it "was limited to trying to settle the case" and that he later discontinued the representation "for a lot of practical reasons or whatever" (AV Dep. at 105-106). Indeed, Mr. Vuckovich insists that he "never got into the facts of Busbice I" (AV Dep. at 106) though it appears that he did bill time to the matter and worked to prepare an answer (AV Dep. Ex. 25). His work on settling the case apparently continued through January 2015 (AV Dep. at 156-158 and Ex. 40). Aside from the cynical explanation that he is now attempting to position himself in the present lawsuit, Mr. Vuckovich's effort to understate his representation of Luxe One is puzzling. It is difficult to understand how Mr. Vuckovich, or any lawyer, could competently represent the defendants in the *Busbice I* lawsuit without investigating the facts behind the allegations in the complaint and attempting to ascertain the merits of the case. This is true even where the lawyer envisions his role as being limited to settling the case.

As noted above in Section III of this Report, Mr. Vuckovich and the CB&V law firm were the recipients of numerous items that can be traced back to Luxe One bank

23

accounts. Mr. Vuckovich subsequently disposed of the funds represented by these items at Mr. Brown's direction.

On July 12, 2013, Luxe One as remitter purchased a Chase cashier's check for $100,000 to the Noble Group (AV Dep. Ex 122), sometimes perhaps also referred to as the Noble International Group (*See* AV Dep. at 211). The Noble Group is an entity controlled by Mr. Brown (*See* AV Dep. at 208-209). Although ostensibly a client of the CB&V law firm, Mr. Vuckovich testified that he had no understanding as to the kind of business conducted by the Noble Group or where it operates, or how it generates revenue (AV Dep. at 208-212). In its dealings with this entity, the CB&V law firm treated the Noble Group as the alter ego of Mr. Brown (*See* AV Dep. Ex. 61). This is the only reasonable way to make sense of Mr. Vuckovich's claim that the Noble Group was *not* a client of the CB&V law firm (AV Dep. at 211), yet the company's name appears in the law firm's internal documents in a ledger entitled "Noble Group-Steve Brown, Client Fund Account" (AV Dep. Ex. 61). Similarly, with respect to another CB&V ledger entitled "Noble Group, Bank Leumi-Dowling Acct." (AV Dep. Ex. 63), Mr. Vuckovich identified the document as "a ledger of this particular bank account regarding Steve Brown/Noble Group" (AV Dep. at 214). Likewise, in his deposition, Mr. Vuckovich referred to a Noble Group cashier's check as "Steve Brown related money" (AV Dep. at 247). Mr. Brown endorsed both a cashier's check that listed Mr. Brown as the payee and a cashier's check that listed the Noble Group as the payee (AV Dep. Ex. 80).

Accordingly, as Mr. Vuckovich explained, "Steve Brown and Noble were kind of treated the same within the law firm" (AV Dep. at 253-254).[8]

The July 12, 2013 cashier's check from Luxe One with the Noble Group as payee (AV Dep. Ex. 122) was endorsed over to the CB&V law firm for deposit into the firm's Lawyer Trust Fund Account at Bank Leumi, No.        701, otherwise known as CB&V's Account No. 701 (*See* AV Dep. at 196-203 and Ex. 58). The CB&V law firm endorsed the check but then apparently Mr. Vuckovich took personal possession of it and endorsed it with the bank account number of one of Mr. Vuckovich's personal accounts at an undisclosed bank, Account No.        719.

In addition to this item, the CB&V law firm received other illicit checks, traceable back to funds that Mr. Busbice invested in Luxe One for the purpose of completing the production and promoting the film "The Letters," or that were drawn on a Luxe One bank account from funds that been wrongfully deposited in that account from the Moment Factory, LLC, an entity in which Mr. Busbice had invested for the purpose of supporting the production and promotion of another film, "Angels Sing." These items include: a November 4, 2013 Chase cashier's check for $50,000 listing Steven J. Brown as the remitter and CB&V as the payee, which CB&V deposited in its Account No. 701

---

[8] Mr. Brown was the person who authorized the deposit of funds in CB&V's trust account for the Noble Group (AV Dep. Ex. 104). Other evidence in the record indicates that the Noble Group was in fact Mr. Brown's sole proprietorship and that he operated the business under other names including PR News Strategies (AV Dep. at 332-333 and Ex. 114). Indeed, in testifying that the notation "Noble" on a check meant "Steve Brown" Mr. Vuckovich explained that "to my law firm, it was the same thing" (AV Dep. at 355).

(Vuckovich 000959-000960)[9]; a November 25, 2013 Chase cashier's check for $50,000 listing Steven J. Brown as the remitter and CB&V as the payee, which CB&V deposited in its Account No. 701 (Vuckovich 000962); a January 6, 2014 Chase cashier's check for $38,000 listing Luxe One Inc. as the remitter and CB&V as the payee, which CB&V deposited in its Account No. 701 and which CB&V credited to Mr. Brown (Vuckovich 000963); a January 27, 2014 Chase cashier's check for $75,000 listing Steven Brown as the remitter and CB&V as the payee, which CB&V deposited in its Account No. 701 (Vuchovich 000966); and an April 14, 2014 Chase cashier's check for $25,000 listing Steven Brown as the remitter and CB&V as the payee, which CB&V deposited in its Account No. 701 (Vuckovich 000967).

The CB&V law firm also subsequently disbursed these wrongfully obtained funds at Mr. Brown's direction. These payments include: a February 3, 2014 check for $138,000 drawn by Mr. Vuckovich on CB&V's Account No. 701 listing Mr. Manashil as the payee (AV Dep. at 345-346 and Ex. 124); and an August 26, 2014 check for $100,000 drawn by Mr. Vuckovich on CB&V's Account No. 701 listing Mr. Manashil as the payee (Vuckovich 000037). This second item is particularly significant in that Mr. Vuckovich issued it in the middle of Mr. Vuckovich's and CB&V's representation of Luxe One in *Busbice I* and in the Big Screen Partners V, Ltd. arbitration.

That is, Mr. Vuckovich paid this item (Vuckovich 000037) from Luxe One funds after Big Screen Partners V, Ltd. filed its demand for arbitration against Luxe One on June 17, 2014 (Vuckovich 000843-000854). In its arbitration demand, Big Screen

---

[9] This document is attached hereto as Exhibit C because it was a document produced by defendants, but it is also attached hereto as Exhibit D because it was produced separately by Bank Leumi.

alleged "that investors in Luxe One have also invested in other Williams entities, and that Williams has comingled and misappropriated funds of Luxe and such other entities" (Vuckovich 000844). It further alleged that Luxe One failed to provide Big Screen with a marketing and distribution plan with a detailed draw-down schedule, when requested (Vuckovich 000846), and that Luxe One had "no intention of honoring its promise" to provide P&A funding for "The Letters" motion picture "because Luxe intended that funds for the P&A Commitment be used for purposes other than P&A for the Picture, including personal luxury items for Williams" (Vuckovich 000847).

Mr. Vuckovich's payment of this item (Vuckovich 000037) from Luxe One funds is even more troubling because it came after Mr. Vuckovich received a July 3, 2014 letter from David Steinberg, an attorney at Dentons Canada LLP representing Left Behind Investments, LLC ("LBI") (the producer of the motion picture "Left Behind"). In the letter, addressed to Mr. Williams, a copy of which was furnished to Mr. Vuckovich (AV Dep. Ex. 28), Mr. Steinberg states that "[s]ome extremely disturbing facts . . . have come to mind in recent weeks." The letter alleges that Mr. Williams' entity, FBTR Family Trust, had not funded the motion picture "Left Behind" as agreed; that Mr. Williams had instead substituted funding from Mr. Busbice through his company Olla Productions, LLC; that Mr. Williams was now asserting a right to the return of excess funding actually belonging to Olla; and that Mr. Williams had also substituted funding owed by Mr. Williams' entity, Panda Media (an entity that appears to go by several names, and the very existence of which Mr. Steinberg doubts), by Luxe One, "a company that is apparently jointly controlled by Bill Busbice (who is now suing you for fraud)" (*Id.*). Mr. Steinberg concludes the letter by reminding Mr. Williams that "using investors' money

without their knowledge and flowing it through these entities does *not* constitute an early release of money from Panda" and that his client, LBI, "was accepting funding from you and your companies on the basis that it was legitimate" (*Id.*).

On October 3, 2014, Mr. Vuckovich filed a lawsuit in Cook County Circuit Court on behalf of Panda Media Fund LLC d/b/a Panda Media Funds against Left Behind Investments, LLC, and several other entities involved in the production and distribution of the motion picture "Left Behind" (AV Dep. Ex. 23). Mr. Vuckovich based the allegations in the complaint on information he obtained either from Mr. Williams, Mr. Brown, or Mr. Reiss (AV Dep. at 68-69). Mr. Vuckovich testified that he did minimal work in preparing to file the Panda Media lawsuit (AV Dep. at 107). Nevertheless, the Panda Media complaint demonstrates that Mr. Vuckovich understood how P&A agreements for financing the promotion of motion pictures worked (*See also* AV Dep. at 65-70) – the very business in which Luxe One was engaged. Presumably, this would also include the knowledge that the funds that make up a P&A commitment are meant exclusively for the promotion of the motion picture in question, and not for the personal use of individuals associated with the project. Mr. Vuckovich's billing records for the matter state that he revised the complaint on October 2, 2014, the day before the lawsuit was filed (AV Dep. Ex. 24). That Mr. Vuckovich was then revising the complaint indicates that he performed work on the matter prior to this date, although I have not seen any billing records that reflect this work. Still, this newly acquired understanding regarding the exclusive use of P&A funds (if it was in fact newly acquired) was roughly contemporaneous with Mr. Vuckovich's representation of Luxe One, which continued into September 2014 (Vuckovich 000222). Prior to this time, Mr. Vuckovich deposited

28

several items from Panda Media Fund, LLC, in its Lawyers Trust Fund Account, CB&V's Account No. 701 (AV Dep. Ex. 19, 20, 21, 22). Mr. Vuckovich claims that in April 2014 he had no understanding of the kind of business Panda did (AV Dep. at 57-58). Mr. Vuckovich also testified that although Panda "was a Williams thing," he "understood Steve Brown to be the client" (AV Dep. at 44, 111).

The serious, detailed, factual allegations of fraud and illegality against Mr. Brown, Mr. Williams, Luxe One and others, set forth in these various sources – the *Busbice I* lawsuit, the Big Screen Partners V, Ltd. arbitration, and the Dentons letter – would have prompted a reasonably competent and faithful attorney to investigate the claims being made and thereby learn the truth of the matter. Because Mr. Vuckovich and the CB&V law firm suffered from a "material limitation" under IRPC 1.7(a)(2), they did not seek to ascertain the truth behind these allegations in the course of their representation of Luxe One. Their failure to do so constituted a breach of the standard of care and a violation of the fiduciary duties they owed to their client, Luxe One.

Rather than investigate the allegations of fraud and illegality, Mr. Vuckovich and the CB&V law firm simply assumed that the actions of Mr. Brown, Mr. Williams and others were entirely proper and lawful. This was true before, during, and after Mr. Vuckovich's representation of Luxe One. Thus, for example, on May 28, 2013, Mr. Vuckovich wrote Mr. Manashil a check for $75,000 drawn on CB&V's Dowling Account at Bank Leumi, No.          812, otherwise known as CB&V's Account No. 812 (AV Dep. Ex. 86).[10] He did so at Mr. Brown's direction (AV Dep. at 268). Likewise, on June

---

[10] A "Dowling Account" is an interest-bearing lawyer trust fund account for funds meant to hold client security retainers. The name is derived from a case, *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277, 875 N.E. 2d 1012 (2007), in which the Illinois

24, 2013, Mr. Vuckovich wrote Mr. Manashil a check for $50,000 drawn on CB&V's Lawyers Trust Fund Account, Account No. 701 (AV Dep. Ex. 88). He did so simply at the direction of Mr. Brown (AV Dep. at 271). Similarly, Mr. Vuckovich testified that, at Mr. Brown's instruction (AV Dep. at 343), he deposited in CB&V's Lawyer Trust Fund Account, Account No. 701, a cashier's check for $100,000 listing Luxe One as the remitter and the Noble Group as the payee (AV Dep. Ex. 122). Again, on July 31, 2013, Mr. Vuckovich wrote Mr. Marc Brown a check for $18,000 drawn on CB&V's Lawyers Trust Account, Account No. 701 (AV Dep. Ex. 66). He did so at Mr. Steve Brown's direction (AV Dep. at 228). Likewise, on February 3, 2014, Mr. Vuckovich wrote Mr. Manashil a check for $138,000 drawn on CB&V's Lawyers Trust Fund Account, Account No. 701 (AV Dep. Ex. 124). He did so at Mr. Brown's instruction (AV Dep. at 346). With respect to the $100,000 check from Panda Media Fund LLC to the CB&V law firm, dated April 12, 2014, that the firm deposited in its Lawyers Trust Fund Account, Account No. 701 (AV Dep. Ex. 19), Mr. Vuckovich testified that "[i]t was money which Steve Brown requested be placed in the trust fund account. It was Steve's money as I understood it" (AV Dep. at 56). Similarly, at Mr. Brown's direction, on May 8, 2015, Mr. Vuckovich wrote ten checks to ten different individuals (including Mr. Manashil and Mr. Reiss) ranging in value from $2480 to $200,000 (AV Dep. Ex. 94, 95, 96, 97, 98, 99, 100, 101, 102, 103). According to Mr. Vuckovich, he wrote the checks off of CB&V's trust account "because it was Brown's money and he directed that the checks be written" (AV Dep. at 319). Without making any inquiry, Mr. Vuckovich

Supreme Court clarified the law regarding attorney retainers, and recognized for the first time the existence of advance payment retainers. In his deposition, Mr. Vuckovich recognized CB&V's Dowling Account as the law firm's client retainer account. (*See* AV Dep. at 12-13, 192-204).

simply assumed that "these were related to movies [Mr. Brown] was – had made or were making, was making, you know, working on" (AV Dep. at 320). The check was written "because I was directed to write it" (AV Dep. at 321), "[b]ecause he told me" (*Id.*). Mr. Vuckovich simply assumed that the money used to pay these checks, forwarded from a Swiss bank account (AV Dep. Ex. 93) was legitimate and not the fruit of a fraudulent scheme. He took Mr. Brown at his word that the money "was payment in connection with making movies or a movie" (AV Dep. at 323). For Mr. Vuckovich "[t]he check was written because I was directed to write it. That's where my knowledge ends" (AV Dep. at 324). Of course, Mr. Vuckovich's knowledge ended there because he made no reasonable inquiry into the source of the funds even though he had been informed by multiple sources that Mr. Brown was at the center of a fraudulent scheme and conspiracy. Mr. Vuckovich made no such inquiry because of his unfailing devotion to Mr. Brown.

The record is replete with other instances of Mr. Vuckovich's studied lack of curiosity in the wake of allegations of fraud against Mr. Brown and the other *Busbice I* defendants. On December 19, 2014, Thomas Prouty of Troutman Sanders, counsel for the plaintiffs in *Busbice I,* wrote to Mr. Vuckovich stating that they had learned through discovery in the case that the CB&V law firm had "received substantial sums of money" from a Luxe One bank account controlled by Mr. Williams and Mr. Brown and "funded entirely" by Mr. Busbice's "fraudulently induced film investments" (AV Dep. Ex. 41). Mr. Prouty wrote that these funds were not "being used for their intended purpose" but were instead being "diverted by Mr. Williams and Mr. Brown to numerous unauthorized third-parties, including CBV" (*Id.*). The letter included copies of bank records supporting these claims. Mr. Prouty also asked that the CB&V law firm respond to the

letter in an honest and forthright manner, and he demanded that the law firm cease any such transfers in the future. As Mr. Vuckovich testified, however, the CB&V law firm did not reply to the letter (AV Dep. at 161). Moreover, in a stunning response, Mr. Vuckovich testified that, upon reading Mr. Prouty's letter, he did not conclude that the letter and enclosures described transfers of money "designed to perpetuate a fraud on Mr. Busbice" (AV Dep. at 161).

Similarly, Mr. Vuckovich testified that after receiving the July 3, 2014 Dentons letter, questioning the actual existence of the Panda Media entity and alleging that Panda had failed in its obligations, he did not make any connection to his earlier receipt of a $100,000 check from Panda Media Fund, LLC that was deposited in his law firm's trust account (AV Dep. Ex. 20). According to Mr. Vuckovich "I don't recall if there was any reason to have a connection" (AV Dep. at 91). For Mr. Vuckovich, there was apparently no reason to re-examine the CB&V trust account to see whether it had been used as part of a fraudulent scheme. In response to the Dentons letter, Mr. Vuckovich doesn't remember having any concern over the letter's accusations concerning Panda Media and Luxe One (AV Dep. at 96). While a reasonably competent and honest lawyer would have been prompted to investigate these serious allegations, Mr. Vuckovich responded with a lack of concern and a well-practiced indifference. Whereas a reasonably competent and honest lawyer would have tried to learn more, Mr. Vuckovich seems to have been determined to know as little as possible. This lack of knowledge was not a coincidence or merely accidental. It was the product of Mr. Vuckovich's devotion to Mr. Brown which, during Mr. Vuckovich's and the CB&V law firm's representation of Luxe One, constituted a material limitation under IRPC 1.7(a)(2).

Under IRPC 1.7(a)(2), a lawyer may also suffer a material limitation in the representation of his or her client due to "a personal interest of the lawyer." In my opinion, Mr. Vuckovich suffered from such a material limitation in his representation of Luxe One. As noted above, Mr. Vuckovich and Mr. Brown have a longstanding personal and professional relationship. To have begun a serious inquiry to discover the truth of the matter with respect to the allegations set forth in the *Busbice I* lawsuit, the Big Screen Partners V, Ltd arbitration, and the Dentons letter would have jeopardized this longstanding relationship. Such an inquiry could also have jeopardized the financial benefit that Mr. Vuckovich and the CB&V law firm enjoyed by virtue of their professional relationship with Mr. Brown.

Further evidence of Mr. Vuckovich's material limitation can be seen in the casual and unserious way in which he appears to approach the topic of conflicts of interest. Mr. Vuckovich testified that the CB&V law firm does not use a computer database to check for conflicts of interest when taking on a matter. Instead, Mr. Vuckovich simply considers the name of the purported client and its adversaries in a proposed lawsuit. Thus, in bringing suit on behalf of Panda Media against Left Behind Investments, LLC (AV Dep. Ex. 23), Mr. Vuckovich made no attempt to learn the identity of the members or owners of Left Behind (AV Dep. at 67-68). Similarly, Mr. Vuckovich summarily concluded that there was no conflict of interest between his clients Luxe One and Panda Media simply because "Panda was not suing Luxe One, and that arbitration matter involving Luxe One was not against Panda" (AV Dep. at 98). He did not consider that Luxe One's and Panda's interests might be adverse in light of the allegation that Luxe One had provided the money for promotion of the "Left Behind" motion picture that

33

Panda was contractually obligated to provide (AV Dep. at 98-99). Mr. Vuckovich simply dismissed the notion. Likewise, although Mr. Vuckovich jointly represented Mr. Brown and Mr. Williams in the *Busbice I* lawsuit, he did not carefully consider the possibility of a conflict of interest because "my representation was for settlement" and "[t]hey had a mutual interest in resolving the case" (AV Dep. at 117-118). Similarly, in filing the Big Screen Partners V, Ltd. arbitration on behalf of Luxe One, Mr. Vuckovich did not consider who the company's shareholders were, or the possibility that Mr. Williams' interests might not be aligned with those of the company (AV Dep. at 155).

By choosing not to investigate the allegations made against his clients in the *Busbice I* lawsuit, the Big Screen Partners V, Ltd arbitration, and the Dentons letter, Mr. Vuckovich acted in favor of Mr. Brown and against the interests of his organizational client, Luxe One. In this Mr. Vuckovich demonstrated an inability to "consider, recommend or carry out an appropriate course of action" in favor his client of Luxe One, "as a result of [his] other responsibilities or interests," namely, those of Mr. Brown. *See* IRPC 1.7, cmt. 8. Because of the superior loyalty that Mr. Vuckovich showed to Mr. Brown, he was unable to exercise "independent professional judgment" on behalf of his corporate client, Luxe One. *Id.* His devotion to Mr. Brown "foreclose[d] courses of action that reasonably should [have been] pursued on behalf of [his other] client," Luxe One. *Id.*

Had Mr. Vuckovich not suffered from a conflict of interest, he would have conducted an investigation into the serious allegations contained in the multiple sources recounted above. A reasonable inquiry by Mr. Vuckovich would have revealed the illicit nature of the monies that had been transferred to Mr. Vuckovich and the CB&V law firm

as part of this fraudulent conspiracy. Once aware of these wrongful acts, as a matter of professional responsibility, Mr. Vuckovich would have been required to act in the same manner set forth above in detail in the previous section of this Report. That is, now having actual knowledge of the fraud, Mr. Vuckovich would have been ethically bound under the standard of care and the fiduciary duties he owed to Luxe One to comply with the various rules of attorney conduct discussed above: IRPC 1.2(d), 8.4, 1.13, 1.4, 1.16, and 4.1.

**C.     Mr. Vuckovich and the CB&V Law Firm Failed to Maintain Proper Records With Respect to Lawyer Trust Accounts, and Misused Their Trust Accounts by Funneling Monies Through Them Unrelated to the Provision of Any Legal Services**

I have also been asked to opine on the conduct of Mr. Vuckovich and the CB&V law firm concerning the obligations of Illinois attorneys with respect to attorney record keeping and the use of lawyer trust accounts. It is my professional opinion that Mr. Vuckovich and the CB&V law firm are guilty of numerous, egregious violations of the Illinois Rules of Professional Conduct concerning these matters. As set forth in greater detail below, Mr. Vuckovich and the CB&V law firm failed to satisfy the most basic requirements of IRPC 1.15, the rule that sets forth the obligations incumbent on all Illinois lawyers concerning the safe-keeping of property held by a lawyer and the conscientious maintenance or records with respect to that property.[11] Moreover, the sheer audacity of their actions must be seen in light of the fact that Mr. Vuckovich holds himself out as an expert in legal ethics (AV Dep. at 15-17).

Rule 1.15(a) of the IRPC as adopted in 2009 and amended in 2015 provides as follows:

---

[11] A similar, though far less detailed, set of obligations with respect to attorney record keeping can be found in Ill. Sup. Ct. Rule 769.

A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be deposited in one or more separate and identifiable interest- or dividend-bearing client trust accounts maintained at an eligible financial institution in the state where the lawyer's office is situated, or elsewhere with the informed consent of the client or third person. For the purposes of this Rule, a client trust account means an IOLTA account as defined in paragraph (j)(2), or a separate, interest-bearing non-IOLTA client trust account established to hold the funds of a client or third person as provided in paragraph (f). Funds of clients or third persons shall not be deposited in a non-interest-bearing or non--dividend-bearing account. Other, tangible property shall be identified as such and appropriately safeguarded. Complete records of client trust account funds and other property shall be kept by the lawyer and shall be preserved for a period of seven years after termination of the representation.

Maintenance of complete records of client trust accounts shall require that a lawyer:

> (1) prepare and maintain receipt and disbursement journals for all client trust accounts required by this Rule containing a record of deposits and withdrawals from client trust accounts specifically identifying the date, source, and description of each item deposited, and the date, payee and purpose of each disbursement;

> (2) prepare and maintain contemporaneous ledger records for all client trust accounts showing, for each separate trust client or beneficiary, the source of all funds deposited, the date of each deposit, the names of all persons for whom the funds are or were held, the amount of such funds, the dates, descriptions and amounts of charges or withdrawals, and the names of all persons to whom such funds were disbursed;

> (3) maintain copies of all accountings to clients or third persons showing the disbursement of funds to them or on their behalf, along with copies of those portions of clients' files that are reasonably necessary for a complete understanding of the financial transactions pertaining to them;

> (4) maintain all client trust account checkbook registers, check stubs, bank statements, records of deposit, and checks or other records of debits;

> (5) maintain copies of all retainer and compensation agreements with clients;

(6) maintain copies of all bills rendered to clients for legal fees and expenses;

(7) prepare and maintain reconciliation reports of all client trust accounts, on at least a quarterly basis, including reconciliations of ledger balances with client trust account balances;

(8) make appropriate arrangements for the maintenance of the records in the event of the closing, sale, dissolution, or merger of a law practice.

Records required by this Rule may be maintained by electronic, photographic, or other media provided that printed copies can be produced, and the records are readily accessible to the lawyer.

Each client trust account shall be maintained only in an eligible financial institution selected by the lawyer in the exercise of ordinary prudence.

Rule 1.15(c) of the IRPC further provides as follows:

A lawyer shall deposit in a client trust account funds received to secure payment of legal fees and expenses, to be withdrawn by the lawyer only as fees are earned and expenses incurred. Funds received as a fixed fee, a general retainer, or an advance payment retainer shall be deposited in the lawyer's general account or other account belonging to the lawyer. An advance payment retainer may be used only when necessary to accomplish some purpose for the client that cannot be accomplished by using a security retainer. An agreement for an advance payment retainer shall be in a writing signed by the client that uses the term "advance payment retainer" to describe the retainer, and states the following:

(1) the special purpose for the advance payment retainer and an explanation why it is advantageous to the client;

(2) that the retainer will not be held in a client trust account, that it will become the property of the lawyer upon payment, and that it will be deposited in the lawyer's general account;

(3) the manner in which the retainer will be applied for services rendered and expenses incurred;

(4) that any portion of the retainer that is not earned or required for expenses will be refunded to the client;

> (5) that the client has the option to employ a security retainer, provided, however, that if the lawyer is unwilling to represent the client without receiving an advance payment retainer, the agreement must so state and provide the lawyer's reasons for that condition.

Rule 1.15 sets forth the obligations that a lawyer must fulfill in holding the funds of clients or third-parties. The Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois publishes a *Client Trust Account Handbook* to serve as a resource for Illinois attorneys in fulfilling their fiduciary responsibilities with respect to the care of client funds and other property.[12] As the ARDC explains:

> Holding property in trust is a non-delegable personal fiduciary responsibility as long as that property remains in the lawyer's possession. This responsibility cannot be transferred and is not excused by ignorance, inattention, incompetence or dishonesty of the lawyer or by the lawyer's associates or non-lawyer employees.

*Id.* at 1. In mandating the holding of client monies and other property in trust, IRPC 1.15 helps to guard against the wrongful acts of commingling and conversion by requiring that the property of clients and third-parties be kept separate from that of the lawyer, and that these monies be accountable, and identifiable. *Id.* at 3-8.

The standards for financial record keeping that a lawyer must abide by are detailed and exacting. Mr. Vuckovich and the CB&V law firm failed to maintain contemporaneous records that were both accurate and complete, as required by Rule 1.15. As a general matter, Mr. Vuckovich and his colleagues did not keep careful records of the clients they engaged or the money they handled on behalf of these clients. Indeed, Mr.

---

[12] ARDC, *Client Trust Account Handbook* (revised Oct. 2017), *available at* https://www.iardc.org/ClientTrustAccountHandbook.pdf.

Vuckovich admitted that their recordkeeping was "somewhat unorganized" and "kind of in a mess" (AV Dep. at 214, 218).

Thus, for example, a document produced by CB&V that Mr. Vuckovich identified as a "check ledger" indicates that it is for CB&V's Dowling Account at Bank Leumi, No. 812, otherwise known as CB&V's Account No. 812 (AV Dep. at 348-351 and Ex. 126). It indicates that check No. 2475 for $100,000 was paid to Mr. Manashil on August 26, 2014. In fact, however, this item was paid from the firm's Lawyer Trust Fund Account at Bank Leumi, No.      ¦701, otherwise known as CB&V's Account No. 701 (Vuckovich 000037). The check ledger, which is heavily redacted, only four pages long, and lists only nine items, is incomplete in other ways. Although IRPC 1.15(a)(1) states that an attorney's records should indicate "the date, payee and purpose of each disbursement," the check ledger provides only the date and the name of the payee. It does not provide a purpose. Mr. Vuckovich testified that, with respect to check No. 2475, the ledger says the purpose is "Noble Brown" (AV Dep. at 350). Those words may identify the client, but they do not indicate the purpose of the disbursement as the rule requires.[13]

Another document produced by CB&V is entitled "Noble Group-Steve Brown, Client Fund Account" (AV Dep. at 206-212 and Ex. 61). This document contains a total of thirty-six entries, both deposits and disbursements. Although it lists the names of payees it does not indicate the purpose behind any of these disbursements as the rule

---

[13] Bridget Atherton, CB&V's bookkeeper (Deposition of Bridget Atherton taken on February 5, 2018 (hereinafter "Atherton Dep.") at 11-13) testified that she was not aware of "any circumstance" when CB&V was disbursing money on a client's behalf "where the purpose for the transaction was not recorded in the ledger" (Atherton Dep. at 45). As set forth in the text above, this claim is demonstrably false.

requires. Moreover, the document merely states that the funds in the account derived from "deposits." It does not indicate the source of these funds as Rule 1.15 requires.

The same could be said of the document produced entitled "Noble Group, Bank Leumi-Dowling Acct." (AV Dep. at 214-217 and Ex. 63). This document contains a total of seven entries including five checks for which it lists the payees. It does not, however, describe the purpose of any of these disbursements. Furthermore, Mr. Vuckovich admitted that although the document ostensibly relates to the law firm's Dowling Account, the document indicates that funds which were not retainer funds were deposited into the account (AV Dep. at 216-217, 245-248, 266 and Ex. 79, 85). Again, the document merely states that the funds in the account derived from "deposits." It does not indicate the source of these funds as Rule 1.15 requires.

Likewise, another document produced entitled "David Williams, Bank Leumi, Client Fund Retainer Acct" contains two entries, a deposit and a disbursement (AV Dep. at 218-220 and Ex. 64). Copies of the item deposited and the check disbursed are attached to the ledger. The item deposited is a Chase cashier's check for $5000 dated June 10, 2014, that lists Adrian Vuckovich as the remitter and the CB&V law firm as the payee. It is accompanied by a deposit slip indicating that the item was deposited *not* into CB&V's retainer account, as Ex. 64 indicates, but into CB&V's Client Fund Account at Bank Leumi, No.        001, otherwise known as CB&V's Account No. 5001, a point that Mr. Vuckovich conceded during his deposition (AV Dep. at 219). The check disbursed is No. 1113 for $5000, dated October 30, 2014, drawn on CB&V's Client Fund Account, Account No. 5001, to the CB&V law firm as payee. Neither the ledger nor the item indicate the purpose of the disbursement.

The CB&V law firm also manufactured a new document in response to a subpoena, a ledger for "Steve Brown" (AV Dep. at 212-218 and Ex. 62). The document contains a total of fourteen entries, including five disbursements (four to Mr. Manashil and one to Mr. Brown's brother, Marc). It does not, however, indicate a purpose behind any of these payments, contrary to what the rule requires. Mr. Vuckovich explained that he prepared Ex. 62 in response to a subpoena because "the records were somewhat unorganized, so this was an effort to provide a somewhat like, you know, slightly neater, organized response" (AV Dep. at 214). It was, he said, "created for the purpose of responding to the subpoena. I was in a hurry. The records were kind of in a mess, and I felt like this – so I created 62, prepared 62" (AV Dep. at 218). Mr. Vuckovich admitted that Ex. 62 does not contain any information not already set forth in Ex. 61 (AV Dep. at 216). Neither document complies with the requirements of Rule 1.15.

In addition to this, the CB&V law firm violated Rule 1.15 in other ways. On at least two occasions, Bridget Atherton, CB&V's bookkeeper (Atherton Dep. at 11-13), wrote checks to herself, signed by Mr. Bargione (Atherton Dep. at 30-32 and Ex. 132, 133). Check No. 1049, dated December 20, 2013, for $1250, is an item issued to Ms. Atherton, drawn on CB&V's Dowling Account, Account No. 812 (Ex.132). Ms. Atherton had no explanation for why she was paid money from the law firm's client retainer account (Atherton Dep. at 30). Ex. 132 contains copies of three other checks, issued to Constance Lichter, Sharon Purnell, and Ms. Atherton, signed by Mr. Bargione, also drawn on the law firm's client retainer account. Check No. 2459, dated August 1, 2014, for $500, is an item issued to Ms. Atherton, drawn on CB&V's Lawyers Trust Fund Account, Account No. 701 (Ex. 133). Ms. Atherton had no explanation for why she

41

was paid money from the law firm's trust account (Atherton Dep. at 31). Plainly, these payments, and the CB&V's memorialization of them, are not in compliance with Rule 1.15.

On at least five occasions, Mr. Vuckovich drew a check out to "cash" drawn on the CB&V law firm's Lawyer Trust Fund Account, Account No. 701 (Atherton Dep. at 32-41 and Ex. 134, 135, 136, 138, 139). Mr. Bargione did the same thing on one occasion (Atherton Dep. Ex. 137). These checks were for substantial amounts of money, ranging from $1940 (Atherton Dep. Ex. 137) to $9000 (Atherton Dep. Ex. 136). Drawing a check to "cash" avoids the very requirements that Rule 1.15 insists upon. That is, the monies derived from a check made out to "cash" can be transferred to anyone and for any purpose. Thus, drawing such a check avoids the requirements set forth in IRPC 1.15. Indeed, in her deposition, CB&V's bookkeeper, Ms. Atherton, admitted that when she wrote these checks and got this cash she did not "make a record in the firm's books as to where the funds were being disbursed" (Atherton Dep. at 41).

In the materials that I have reviewed, numerous other irregularities appear with respect to CB&V's records. Mr. Vuckovich testified that monies deposited in a lawyer trust fund account need not be traceable to someone (AV Dep. at 56). He also testified that Mr. Brown's requests for deposits into CB&V's trust fund account were all made orally – nothing in writing (AV Dep. at 56-57). Mr. Vuckovich further testified that neither he nor the CB&V law firm had any "engagement letters, retainer agreements, or other documents reflecting the terms and scope of representation" regarding any of the individuals or entities involved in this lawsuit and that no such documents were ever created (AV Dep. at 20-21 and Ex. 11).

According to Mr. Vuckovich, CB&V was not required to have any documentation regarding fees, such as an invoice. In his representation of Panda Media Fund LLC, Mr. Vuckovich testified that he did not send an invoice for the legal work he performed. Indeed, Mr. Vuckovich testified that he received a retainer for this work but did not send the client a bill to show the he had applied the retainer (AV Dep. at 75-82 and Ex. 24, 25). Mr. Vuckovich testified that he "didn't prepare specific bills for Steve Brown" (AV Dep. at 255). He testified that he could simply accept a check for payment of fees. According to Mr. Vuckovich, all that is needed is the check and a deposit slip. "Nothing further is required" (AV Dep. at 254). Mr. Vuckovich further testified that the authorization from a client to disburse funds from a trust account need not be in writing. The check itself represents the authorization (AV Dep. at 228).

Neither Rule 1.15 nor Rule 1.5 of the IRPC (the rule governing a lawyer's fees) requires a lawyer to send a written invoice to a client, or (aside from two discrete exceptions)[14] to even record a client fee agreement in writing. Rule 1.5(b) provides that a lawyer shall communicate to the client the "scope of the representation and the basis or rate of the fee and expenses for which the client shall be responsible . . . preferably in writing." Because it is not mandatory that the communication be in writing, however, this rule expresses a kind of "best practice." What is mandatory, however, is the requirement under Rule 1.15(a) that a lawyer maintain documents for all client trust accounts stating the "purpose of each disbursement." Mr. Vuckovich and the CB&V law firm failed to do this with respect to the disbursements at issue in this case.

---

[14] IRPC 1.5(c) requires a contingent fee agreement to be in writing and signed by the client, and IRPC 1.5(e) requires that the division of a fee between lawyers who are not in the same firm must be confirmed in writing and agreed to by the client.

Although Mr. Vuckovich testified that all financial records concerning client matters are kept in paper form in CB&V's office (AV Dep. at 23) and that all documents responsive to plaintiff's document request were produced (AV Dep. at 24), and that no documents were lost or destroyed (AV Dep. at 26), I do not believe that the modest number of documents produced – sometimes erroneous, often incomplete – show that the CB&V law firm satisfied its obligations under Rule 1.15. Indeed, these few documents demonstrate a colossal ethical failure on the part of the CB&V law firm.

Rule 1.15 sets forth a lawyer's mandatory responsibilities in holding the funds of clients and third-parties in connection with a legal representation. That is, Rule 1.15 contemplates the possibility that a lawyer may hold the "property of clients or third persons . . . *in connection with a representation*" and that this property will be held "separate from the lawyer's own property." IRPC 1.15(a) (emphasis added). Thus, the rule prescribes the use of interest-bearing client trust accounts for such property, as well as trust accounts for the deposit of security retainers, both of which must be maintained separate from the lawyer's own business and other personal accounts. *See* IRPC 1.15 (a) and (c). Similarly, Rule 1.15 and the comments that accompany it repeatedly refer to the "property of *clients*" and "*client* trust accounts," indicating the presence of an attorney-client relationship and the provision of legal services. Likewise, comment 5 to IRPC 1.15 specifically notes that "[t]he obligations of a lawyer under this Rule are independent of those arising from activity other than rendering legal services. For example, a lawyer who serves only as an escrow agent is governed by applicable law relating to fiduciaries even though the lawyer does not render legal services in the transaction and is not governed by this Rule."

Plainly, IRPC 1.15 envisions the use of a lawyer trust account in support of an attorney-client relationship. As such, the rule does *not* contemplate the use of lawyer trust accounts unrelated to the provision of legal representation. Indeed, it is improper for an attorney to make use of his or her trust accounts where the monies deposited are unrelated to the representation of a client and the provision of legal services. It is likewise improper to make use of such accounts in order to conceal fraudulently obtained funds behind the facade of legitimacy supplied by the presumption of legal representation.

The materials that I have reviewed show that Mr. Vuckovich knew that he frequently held funds in CB&V's trust accounts unrelated to the provision of any legal services and unrelated to any legal representation. Indeed, it was Mr. Vuckovich's routine practice to make use of CB&V's lawyer trust accounts for reasons unrelated to actual legal representation. According to Mr. Vuckovich "[s]ometimes people prefer to have monies transacted through the lawyer than through personal accounts" (AV Dep. at 55).[15] Remarkably, Mr. Vuckovich appears to believe that this is a legitimate use of lawyer trust accounts: "[S]ome people want to transact their affairs through a lawyer, and that's another reason that a Client Fund account is used" (AV Dep. at 250).

---

[15] Consistent with this practice, with respect CB&V's ledger entitled "Nobel Group-Steve Brown, Client Fund Account" (Ex. 61), Bridget Atherton, CB&V's bookkeeper, testified that she was not aware of Mr. Vuckovich "performing any legal work in connection with the checks that were coming in and out of this account" (Atherton Dep. at 55). Although Ms. Atherton prepared invoices for CB&V, she had no explanation as why "there was no invoice ever generated for the items listed in Exhibit 61" (Atherton Dep. at 72). Ms. Atherton also testified that she had never seen "any documentation" reflecting that CB&V had been compensated "for legal work that it did" for either the Noble Group or Steve Brown (Atherton Dep. at 74).

Mr. Vuckovich attempts to justify this misuse of a lawyer trust account by making an analogy. He notes that "[i]t is not unusual for people to have money directed to a lawyer's client fund account rather than to themselves. Every personal injury case settles in that manner" (AV Dep. at 54-55). Of course, in the example Mr. Vuckovich cites – insurance proceeds in a personal injury suit – the insurance company is involved in the case (albeit not always as a party), and the insurance funds that the lawyer takes possession of and holds in trust are related to his or her legal representation of a client in the matter. The same cannot be said of Mr. Vuckovich or the CB&V law firm. The funds that Mr. Vuckovich and the CB&V law firm received were often unrelated to any legal representation they had undertaken. Indeed, Mr. Vuckovich testified with respect to numerous checks deposited in the firm's trust accounts, that they did not relate to any legal services undertaken or performed. Instead, the CB&V trust accounts were simply used as platform from which Mr. Brown could distribute money under the presumed legitimacy of an ostensible attorney-client relationship.

Thus, for example, on May 4, 2015, the CB&V law firm received a wire transfer of $300,000 from a Swiss bank that was deposited in its Lawyers Trust Fund Account, Account No. 701 (*See* AV Dep. Ex.93). On May 8, 2015, Mr. Vuckovich wrote ten checks to ten different individuals on CB&V's Lawyers Trust Fund Account, Account No. 701, making use of this money (*See* AV Dep. Ex. 94, 95, 96, 97, 98, 99, 100, 101, 102, 103). Yet Mr. Vuckovich testified that with respect to facilitating these transactions, CB&V performed no legal work and was not compensated for its check writing (AV Dep. at 338).

Likewise, with respect to the July 12, 2013 Chase cashier's check for $100,000 listing Luxe One as the remitter the Noble Group as the payee (AV Dep. Ex 122), Mr. Vuckovich testified that he was "not performing any legal services" with respect to the item and the attempted deposit of it in CB&V's trust account, and the eventual deposit of the item in Mr. Vuckovich's personal account (AV Dep. at 343-344).[16]

Similarly, on May 18, 2015, CB&V received $250,000 wired into its Lawyers Trust Fund Account, Account No. 701, from a Swiss bank account (AV Dep. Ex. 106). On May 21, 2015, Mr. Vuckovich wrote four checks drawing on these funds to four different individuals (including Mr. Manashil) totaling almost $100,000 (*See* AV Dep. Ex. 107, 108, 109, 110). Then that same day, CB&V wired the remaining $150,000 to a New York bank for the benefit of Bade LLC (AV Dep. 111).

Likewise, on June 1, 2015, CB&V received $50,000 wired into its Lawyers Trust Fund Account, Account No. 701, from a Swiss bank account (AV Dep. Ex. 112), and two days later, June 3, 2015, CB&V wired this money to a New York bank for the benefit of PR News Strategies LLC (AV Dep. 113), a sole-proprietorship of Mr. Brown's (AV Dep. Ex. 114). Similarly, on June 18, 2015, CB&V received $250,000 wired into its Lawyers Trust Fund Account, Account No. 701, from a Swiss bank account (AV Dep. Ex. 115), and on the very next day, June 19, 2015, CB&V wired this money to a New York bank, again for the benefit of PR Strategies LLC (AV Dep. 116).

---

[16] If these monies truly represented client trust funds, then their deposit in Mr. Vuckovich's personal account constitutes conversion. If these monies were in fact the property of Mr. Vuckovich, then his attempt to deposit them in his law firm's trust fund account was an effort to comingle funds. Both of these actions are violations of IRPC 1.15.

The materials that I have reviewed indicate that Mr. Vuckovich did perform some legal services: representation of the defendants in both the *Busbice I* lawsuit and the Big Screen Partners V, Ltd. arbitration, and perhaps some work relating to the purchase of a condominium in Santa Monica.[17] However, nothing in the record suggests that CB&V performed any legal services with respect to any of the funds described above.[18] The CB&V trust account simply served as a conduit for cash. All of this is, of course, contrary to the express language of Rule 1.15(a), which identifies monies held in a client trust account as necessarily being held "in connection with a representation." In response to this, however, Mr. Vuckovich simply asserts: "Sometimes monies come in that are in connection with a legal matter. Sometimes people prefer to have monies transacted through the lawyer than through personal accounts. There was nothing unusual about this to me at the time" (AV Dep. at 55-56). Perhaps there was nothing unusual about these sorts of practices occurring at the CB&V law firm. But there surely was something deeply unethical about these practices.

---

[17] In making this observation, I am not commenting on the ethics or the quality of the representation provided by Mr. Vuckovich and the CB&V law firm in any of these matters. As should be clear from Section V, Part B of my Report, it is my professional opinion that Mr. Vuckovich and the CB&V law firm suffered from a grave conflict of interest that severely impaired their representation of Luxe One in both the *Busbice I* lawsuit and the Big Screen arbitration. I have no opinion with respect to what, if any, legal work CB&V performed with respect to the purchase of the Santa Monica condominium. (There are no invoices for any such work from CB&V. *See* AV Dep. at 183). Aside from the question of whether CB&V performed any legal work, the transaction itself was illicit in that funds used to make the purchase were fraudulently obtained from Mr. Busbice.

[18] In her deposition, CB&V's bookkeeper, Ms. Atherton, testified that with respect to Ex. 93, 106, 111, 112, and 113, she was never asked to prepare a statement for services relating to these wire transfers, nor was she aware of CB&V ever being compensated "in connection with any legal services rendered in connection with wire transfers coming from a Swiss bank account" (Atherton Dep. at 94-95).

It is my professional opinion that no one could reasonably conclude the Mr. Vuckovich and the CB&V law firm satisfied their obligations under the rules governing attorney conduct in Illinois concerning attorney record keeping and the proper maintenance of lawyer trust accounts. Moreover, in my opinion, the conduct evidenced by Mr. Vukovich and the CB&V law firm is plainly consistent with the actions of an attorney who sought to aid and abet clients engaged in a scheme to defraud others.

_John M. Breen_
John M. Breen

_March 21, 2018_
Date

# Appendix

## Report of John M. Breen

| | |
|---|---|
| Exhibit A | C.V. of John M. Breen |
| Exhibit B | Second Amended Complaint |
| Exhibit C | Vuckovich 000037, Vuckovich 000222-000223, Vuckovich 000843-000854, Vuckovich 000959-000960, Vuckovich 000962-000963, Vuckovich 000966-000967. |
| Exhibit D | A November 4, 2013 Chase cashier's check for $50,000 listing Steven J. Brown as the remitter and CB&V as the payee, which CB&V deposited in its Account No. 701 produced by Bank Leumi. |

The following documents were also relied upon and already in defendants' possession or are being produced contemporaneously with this Report.

The deposition of Adrian Vuckovich taken on November 30, 2017 and December 1, 2017 with exhibits.

The deposition of Bridget Atherton taken on February 5, 2018 with exhibits.

Charts providing by plaintiffs' forensic accounting expert, Joan Martin, which are all attached as exhibits to Ms. Martin's expert report.

# EXHIBIT A

# JOHN M. BREEN

510 North Main Street
Naperville, Illinois 60563
(630) 579-1066
jbreen1@luc.edu

## EXPERIENCE:

**LOYOLA UNIVERSITY CHICAGO SCHOOL OF LAW**    (Chicago, Illinois)
*Georgia Reithal Professor of Law,* 2018-present
*Professor of Law,* 2009-2018
*Associate Professor of Law,* 2002-2009
*Assistant Professor of Law,* 1996-2002

- Teaching courses in Professional Responsibility, Contracts, Sales, Negotiable Instruments, Jurisprudence and Catholic Social Thought
- Faculty advisor to the *Loyola University Chicago Law Journal*
- Service on the Faculty Appointments Committee, Committee on Community Relations, Curriculum Committee, Committee on Faculty Advancement, Faculty Advisory Committees for untenured colleagues, and the Admissions Discrepancy Committee

**DETROIT COLLEGE OF LAW AT MICHIGAN STATE UNIVERSITY**    (Detroit, Michigan)
*Visiting Associate Professor of Law,* 1994-1996

- Teaching courses in Commercial Transactions, Constitutional Law, and Legal Profession

**SIDLEY & AUSTIN**   (Chicago, Illinois)
*Associate*, 1989-1994

- Practice included commercial litigation involving a wide variety of cases dealing with breach of contract, commercial fraud, insurance coverage litigation and appellate practice

**HONORABLE BOYCE F. MARTIN, JR.**   (Louisville, Kentucky)
United States Court of Appeals for the Sixth Circuit
*Law Clerk, 1988-1989*

## EDUCATION:

**HARVARD UNIVERSITY**   (Cambridge, Massachusetts)
*J.D.,* 1988

- Board of Student Advisors                                    1986-1988
  Co-Chair, Ames Moot Court Cases Committee      1987-1988
- Harvard Catholic Law Students Association           1985-1988
- Harvard Law School Democrats                            1985-1988
- Harvard Journal on Legislation                             1985-1986

**UNIVERSITY OF NOTRE DAME**   (Notre Dame, Indiana)
*B.A.,* 1985, Program of Liberal Studies (The Great Books Program)

- Graduated with *Highest Honors*
- Elected to Phi Beta Kappa
- Selected to the Notre Dame London Program
- Volunteer, Logan Center for the Mentally Handicapped
- Intramural sports

## LEGAL WRITING:

*The Thinness of Catholic Legal Education, A Review of Robert J. Kaczorowski, FORDHAM UNIVERSITY LAW SCHOOL: A HISTORY* (with Lee Strang), 14 U. ST. THOMAS L. J. __ (2018)

*The Forgotten Jurisprudential Debate: Catholic Legal Thought's Response to Legal Realism* (with Lee Strang), 98 MARQUETTE L. REV. 1203 (2015)

*A Brief History of American Catholic Legal Education: The Arc of an Uncertain Identity* (book chapter with Lee Strang) in AMERICAN LAW FROM A CATHOLIC PERSPECTIVE: THROUGH A CLEARER LENS (Roanld J. Rychlak ed. 2014)

*Abortion, Religion, and the Accusation of Establishment: A Critique of Justice Stevens' Opinions in* Thornburgh, Webster, *and* Casey, 39 OHIO N.U. L. REV. 823 (2013)

*The Road Not Taken: Catholic Legal Education at the Middle of the Twentieth-Century* (with Lee Strang), 51 AM. J. LEGAL HIST. 553 (2011) (peer reviewed)

*Religion and the Purification of Reason: Why the Liberal State Requires More Than Simple Tolerance,* 33 CAMPBELL L. REV. 505 (2011) (invited symposium piece)

*Love, Truth, and the Economy: A Reflection on Benedict XVI's* Caritas in Veritate, 33 HARV. J. L. & PUB. POL'Y 987 (2010) (solicited article)

*The Golden Age That Never Was: Catholic Law Schools From 1930-1960 and the Question of Identity* (with Lee Strang), 7 J. CATH. SOCIAL THOUGHT 489 (2010)

*Neutrality in Liberal Legal Theory and Catholic Social Thought*, 32 HARV. J. L. & PUB. POL'Y 513 (2009)

*Priest, Prophet, and King: Abortion, the Vocation of Catholic Politicians, and the Culture of Life*, 6 J. CATH. SOCIAL THOUGHT 353 (2009)

*Modesty and Moralism: Justice, Prudence and Abortion – A Reply to Skeel & Stuntz,* 31 HARV. J. L. & PUB. POL'Y 219 (2008)

*John Paul II, the Structures of Sin and the Limits of Law,* 52 ST. LOUIS U. L. J. 317 (2008)

*Action as the Fruit of Contemplation: A Reply to Bryce, Donnelly, Kalscheur, and Nussbaum*, 43 GONZAGA L. REV. 645 (2007/08)

*The Air in the Balloon: Further Notes on Catholic and Jesuit Identity in Legal Education,* 43 GONZAGA L. REV. 41 (2007/08)

*Never Get Out'a the Boat*: Stenberg v. Carhart *and the Future of American Law* (with Michael A. Scaperlanda), 39 CONN. L. REV. 1 (2006); reprinted in 62 *Revista do Ministrerio Publico do Rio Grande do Sul* (Nov. 2008-Abr. 2009)

*The Catholic Lawyer: "Faith" in Three Parts* 20 NOTRE DAME J.L. ETHICS & PUB. POL'Y 431 (2006)

*Justice and Jesuit Legal Education: A Critique*, 36 LOYOLA U. CHICAGO L. J. 383 (2005)

*The Catholic Lawyer and the Meaning of "Success,"* 40 CATH. LAW. 227 (2001)

*The Law and Liberal Learning: What the Great Books Have to Offer the Legal Profession,* PROGRAMMA, Fall 2001

*Conflicts of Interest in the Small Firm Setting* (book chapter with Barry S. Alberts) in LITIGATION ETHICS: COURSE MATERIALS FOR CONTINUING LEGAL EDUCATION (American Bar Association 2000)

*Statutory Interpretation and the Lessons of Llewellyn*, 33 LOYOLA OF LOS ANGELES L. REV. 263 (2000)

*The Catholic Lawyer: Justice and the Incarnation*, 39 CATH. LAW. 269 (2000), reprinted in the FELLOWSHIP OF CATHOLIC SCHOLARS QUARTERLY, Spring 2001

*The Lost Volume Seller and Lost Profits Under U.C.C. §2-708(2): A Conceptual and Linguistic Critique*, 50 U. MIAMI L. REV. 779 (1996)

## WORKS IN PROGRESS:

*A Light Not Seen: A History of Catholic Legal Education in the United States* (book project, with Lee Strang)

*Storms of Change on the New Frontier: Catholic Identity in Legal Education 1960-1990* (with Lee Strang, planned spring submission 2018)

*Be Not Afraid: Catholic Legal Education from 1990-Today* (in progress)

*The Substance of Things Hoped For: A Prescription for Catholic Legal Education* (in progress)

*No Laughing Matter: Justice Stevens, the Establishment Clause and the Jurisprudence of Abortion* (in progress)

*The Reasonableness of Faith and the "Faithiness" of Reason* (in progress)

*Fair Deals, Good Deals, and Real Deals: Liberal Neutrality, Catholic Social Thought and American Contract Law* (in progress)

*The "Clear and Present Danger" of Justice Kennedy's Hyperbole: Toward a Comprehensive Theory of Restrictions on Attorney Speech* (in progress)

## LECTURES AND PRESENTATIONS:

*The Attorney Client Privilege and the Duty of Confidentiality in the Electronic Age*, (Association of Women Attorneys of Lake County, "2018 Ethics and Professionalism Seminar," College of Lake County, Greyslake, Illinois, January 12, 2018)

*The First Amendment and Free Exercise of Religion:* Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission, (Constitutional Rights Foundation of Chicago, "Equal Justice Under Law" program, panel discussion, Dirksen Federal Building, Chicago, Illinois, December 8, 2017)

*Saving Nature by Saving the Human: What Is Natural Law? & Is It Still Relevant?* (Catholic Lawyers Guild of Chicago, panel discussion, Skadden, Arps, Slate, Meagher & Flom, Chicago, Illinois, December 7, 2017)

*Academic Freedom and Catholic Identity: A Misunderstood Relation*, (Univ. St. Thomas School of Law, Univ. St. Thomas Law Journal Symposium on "Academic Freedom in Catholic Universities: Where the Church Does Its Thinking," November 17, 2017) (with Lee Strang)

*Discrimination, Identity, and the Professional Responsibility of Lawyers*, (Multicultural Law Student Association, panel discussion, "Combatting Hate Speech," DePaul University College of Law, November 2, 2016)

*Communication Is Key: But Receivers Must Stay Within Ethical Boundaries* (National Association of Federal Equity Receivers, 5th Annual Conference, panel discussion, Mayflower Hotel, Washington, D.C., October 14, 2016)

Obergefell v. Hodges*, One Year Out: What the Past Twelve Months Tell Us About the Future of Religious Liberty* (Christian Legal Society*,* Northern Illinois Chapter*,* panel discussion "The Supreme Court's *Obergefell* Decision One Year Out," Chicago, Illinois, July 6, 2016)

*Discrimination, Identity, and the Professional Responsibility of Lawyers*, (Arab American Bar Association, panel discussion, "Islamophobia and the Rule of Law," Loyola University Chicago School of Law, April 21, 2016)

*Catholic Legal Education in the United States: Its History, Promise, and Reality* (Yale Law School, Yale Catholic Law Students Association, March 7, 2016) (with Lee Strang)

*Can We All Get Along?:* Obergefell v. Hodges *and the Meaning of Rationality in Constitutional Adjudication*, (Rueben J. Clark School of Law, Brigham Young University, "Symposium on the Implications of *Obergefell v. Hodges* for Family, Faith, and the Future," October 12, 2015)

*The Salient Characteristics of* Obergefell v. Hodges, (Christian Legal Society, Northern Illinois Chapter, panel discussion, "The Supreme Court's *Obergefell v. Hodges* Decision: First Blush Reactions and Reviews," Chicago, Illinois, July 1, 2015)

*Catholic Legal Theory in Catholic Law Schools: Past and Present*, (Villanova University School of Law, 9th Annual John F. Scarpa Conference on Law, Politics, and Culture, "Catholic Legal Theory: Aspirations, Challenges, and Hopes," April 24, 2015)

*The Substance of Things Hoped For: A Prescription for Catholic Legal Education*, (Pepperdine University School of Law, Nootbaar Religious Legal Theory Conference on "Wisdom, Law, and Lawyers," February 15, 2015) (with Lee Strang)

*The Challenge of Being a Catholic Lawyer Today*, (Loyola Academy Bar Association, Loyola University Chicago School of Law, November 19, 2014)

*Past as Prologue and Resorting to Unreason: The Role of Pre-*Roe *Regulation and the Establishment Clause Argument in the Abortion Debate* (University of Chicago Law School, Law Students for Life, November 18, 2014)

*Legal Scholarship Under Catholic Inspiration* (Religiously Affiliated Law Schools Conference, "Religious Identity in a Time of Challenge for Law Schools," University of St. Thomas School of Law, Minneapolis, Minnesota, September 19, 2014)

*Current Challenges to Religious Liberty* (Loyola University Chicago, Cuneo Hall, April 23, 2014)

*Catholicism, Global Development, and the Professional Life* (Hank Center for Catholic Intellectual Heritage, panel discussion of ROBERT CALDERISI, EARTHLY MISSION: THE CATHOLIC CHURCH AND WORLD DEVELOPMENT (Yale Press, 2013) including the author, Loyola University Chicago, Beane Hall, April 2, 2014)

*Legal Ethics and Professional Responsibility* (ABA Law Student Division – Seventh Circuit, Spring Meeting, "Skills Forward – Preparing Tomorrow's Lawyer Today," Loyola University Chicago School of Law, February 22, 2014)

*Religious Liberty in the United States: An Historical Overview* (Speak Out Illinois 2014, "Empowered for Life: Putting Truth Into Action," Crowne Plaza O'Hare Hotel, February 1, 2014)

*Tikkun Olam from a Catholic Perspective* (DePaul University College of Law, Center for Jewish Law & Judaic Studies Conference on "Repairing a Broken World: Comparative Perspectives on Social Justice as a Religious Mandate," October 24, 2013)

*Arab American Bar Association CLE Course: Current Challenges to Religious Liberty: Same-Sex Marriage and the HHS Mandate* (Polsinelli Shughart PC, Chicago, Illinois, September 25, 2013)

*"Oh Say Can You See": The Coming Wave of Religious Intolerance* (St. John's Catholic Church, Villa Park, Illinois, September 11, 2013)

*"Oh Say Can You See": The Coming Wave of Religious Intolerance* (Catholic Citizen of Illinois, Union League Club of Chicago, July 12, 2013)

*Legal Discourse and Religion: The Strategy of Winning an Argument Without Having One – The Case of Abortion* (Ohio Northern University School of Law, Carhart Symposium on Law and Religion, April 12, 2013)

*Liberty, Equality, Marriage and the Law* (Catholic Lawyers' Guild of Springfield, Cathedral of the Immaculate Conception, Springfield, Illinois, February 18, 2013)

*A Primer on the Religion Clauses of the First Amendment* and *Religious Symbols in Public Spaces – The Four "C"s: Commandments, Crosses, Coins, and City Seals* (Chicago Bar Association, CLE Seminar "Deck the City Halls?: Religious Expression in the Public Square" December 19, 2012)

*A Light Not Seen: A History of Catholic Legal Education in the United States* (Creighton University School of Law, faculty workshop, October 4, 2012) (with Lee Strang)

*"Awake O Sleeper": The Church, the Law, and the Threat to Religious Liberty* (Speaker Series, Our Lady of the Woods Parish, Orland Park, Illinois, September 11, 2012)

*Neither A Wall Nor An Open Door: An Overview of Establishment Clause Jurisprudence* (Chicago Bar Association, CLE Seminar "When Church and State Collide," June 22, 2012)

*"Awake O Sleeper": The Church, the Law, and the Threat to Religious Liberty* (Archdiocese of Chicago Institute for Diaconal Studies, St. Lambert Parish, Skokie, Illinois, June 16, 2012)

*Arab American Bar Association CLE Course on Professional Responsibility* (Polsinelli Shughart PC, Chicago, Illinois, June 13, 2012)

*Storms of Change on the New Frontier: Catholic Identity in Legal Education 1960-1990* (Pepperdine University School of Law, Nootbaar Religious Legal Theory Conference on "The Competing Claims of Law and Religion: Who Should Influence Whom?," February 25, 2012)

*The Forgotten Jurisprudential Debate: The Encounter Between Legal Realism and Catholic Legal Thought From 1930-1960* (University of Notre Dame, Notre Dame Center for Ethics and Culture Conference on "Radical Emancipation: Confronting the Challenge of Secularism," November 11, 2011)

*No Laughing Matter: Justice Stevens, the Establishment Clause and the Jurisprudence of Abortion* (21st Annual University Faculty for Life Conference, University of Notre Dame, June 10, 2011)

*Religion and the Purification of Reason: Why the Liberal State Requires More Than Simple Tolerance* (Annual Conference on Catholic Legal Thought, University of Oklahoma College of Law, May 17, 2011)

*Life: A Summary of Catholic Moral Teaching and an Application to the Practice of Law* (Catholic Charities of Chicago, CLE professional responsibility presentation, St. Peter's in the Loop, Chicago, Illinois, May 12, 2011)

*Religion and the Purification of Reason: Why the Liberal State Requires More Than Simple Tolerance* (Campbell University School of Law, Symposium Conference on "Liberalism, Constitutionalism, and Christianity," Raleigh, North Carolina, March 18, 2011)

*Thomas More: Model of Integrity* (Lumen Christi Institute, Characters of the Reformation Lecture Series, University of Chicago, October 21, 2010)

*What Is Justice?: Two Ideas Compete for Your Allegiance* (Speaker Series, St. Catherine Laboure Parish, Glenview, Illinois, February 14, 2010)

*Law and the Color Purple* (Northwestern University School of Law, St. Thomas More Society, November 2, 2009)

*No Laughing Matter: Justice Stevens, the Establishment Clause and the Jurisprudence of Abortion* (17th Annual Meeting of the Society of Catholic Social Scientists, University of Mississippi School of Law, October 30, 2009)

*The Road Not Taken: Catholic Legal Education at the Middle of the Twentieth Century* (Villanova University School of Law, Symposium on Catholic Social Thought and the Law: Catholic Social Thought and Legal Education, September 26, 2009)

*The Absence and Presence of Hope in American Law: A Reflection on* Spe Salvi (Annual Conference on Catholic Legal Thought, Catholic University of America School of Law, June 10, 2009)

*An Overview of* Centesimus Annus (Cathedral of the Holy Name Lecture Series, Chicago, Illinois November 19, 2008)

*Priest, Prophet, and King: The Call to Public Service and the Culture of Life* (Villanova University School of Law, Symposium on Catholic Social Thought and the Law: Catholic Social Thought and Citizenship, October 11, 2008)

*Catholic Legal Theory and the Misunderstood Relation Between Faith and Reason* (Annual Conference of Catholic Legal Thought, Seattle University School of Law, May 30, 2008)

*John Paul II, Law, Culture and the Regulation of Abortion* (15th Annual Meeting of the Society of Catholic Social Scientists, St. John's University School of Law, October 26, 2007)

*Reunion 2007 Professional Responsibility Program for CLE* (Loyola University Chicago School of Law, September 7, 2007)

*Modesty and Moralism – Responding to Bill Stuntz and David Skeel on Abortion* (Conference on Christian Legal Thought, Washington D.C., January 6, 2007)

*Making a Choice:  The Reality of Communion and Support for Abortion Rights Among Catholic Politicians* (the Sheil Catholic Center, Northwestern University, May 16, 2006)

*The Air in the Balloon:  Further Notes on Catholic and Jesuit Identity in Legal Education* (Baylor University School of Law, Conference of Religiously Affiliated Law Schools, March 31, 2006)

*A Critical Look at Jesuit Legal Education* (University of Notre Dame, Notre Dame Center for Ethics and Culture Conference on "Joy in the Truth:  The Catholic University in the New Millennium," September 30, 2005)

*A Partial Meeting of the Minds: The Principle of Subsidiarity and Contract Law* (Conference on "Taking Christian Legal Thought Seriously," San Francisco, January 8, 2005)

*Liberal Neutrality, Catholic Social Thought and American Contract Law* (Villanova University School of Law, Symposium on Catholic Social Thought and the Law, October 3, 2003)

*Newman, Loyola, the University and the Great Desire for Justice: A Response to John Haughey* (Loyola University Chicago, April 2, 2002)

*The American Response to the Events of September 11th in Light of the Catholic Teaching on Just War* (Ss. Peter & Paul Roman Catholic Church, Naperville, Illinois, December 4, 2001)

*The Law and Liberal Learning: What the Great Books Have to Offer the Legal Profession* (University of Notre Dame, Conference Celebrating the 50th Anniversary of the Program of Liberal Studies, April 4-5, 2001)

*Interpreting Article 2 and Interpreting Agreements Under Article 2: Llewellyn's Disparate Treatment of Text and Context* (Cumberland Law School, Samford University, Law and History Colloquium May 1, 1998)

*The Law of Contract Formation and Damages Under Article 2 of the U.C.C.* (Fundacâo Getulio Vargas, Porto Alegre, Brazil, November 6, 1997)

*Introduction to the Law of Negotiable Instruments in American Law* (Universidade Do Vale Do Rio Dos Sinos, Sao Leopoldo, Brazil, November 3, 1997)

*Beyond* Gentile*: An Analysis of the History, Purpose and Future of Ethical Rules Governing Trial Publicity* (National Lawyers Association Annual Meeting, Chicago, Illinois, September 20, 1996)

*Ethics for Externs: New Horizons and New Limitations* (address to legal externship students at the Detroit College of Law, March 15, 1995)

## SERVICE:

| | |
|---|---|
| Lumen Christi Institute, University of Chicago<br>    *Law & Culture Forum, Academic Chair* | 2002-2012 |
| Illinois Supreme Court, Committee on Professional Responsibility<br>    *Reporter* | 2000-2003 |
| Cornell Law School, Legal Information Institute<br>    American Legal Ethics Library - Illinois entry<br>    *Contributor* | 1999-2004 |
| Catholic Conference of Illinois<br>    *Board of Directors – Lay Member* | 2012-present |
| Catholic-Jewish Scholars Dialogue, Chicago | 2009-Present |
| Thomas More Society<br>    *Board of Directors* | 2016-present |

Arab-American Bar Association of Illinois
- *Founding Member*                                                                1990
- *Board of Directors*                                              1992-94; 1996-2005; 2015-present
- *Treasurer*                                                                        2005-2009
- *Vice President*                                                                2009-2012

- *President*      2012-2015

Arab American Voter Initiative
     *Board of Directors*      2006-2016

Law Consortium for Palestinian Legal Education      May 2001-Dec. 2002
     *Co-Faculty Director*

SS. Peter & Paul Roman Catholic Church, Naperville, Illinois
     *Parish Council Member*      2002-2009

## BAR MEMBERSHIPS:

Supreme Court of Illinois
U.S. Court of Appeals for the Sixth Circuit
U.S. Court of Appeals for the Seventh Circuit
U.S. District Court for the Northern District of Illinois

## EXPERT TESTIMONY WITHIN THE LAST FOUR YEARS:

*MDA City Apartments, LLC v. DLA Piper US LLP* (Cook County Circuit Court, No. 12-L-7622) (2013-2014) (report and deposition)

## PERSONAL:

Born May 30, 1963, Louisville, Kentucky; married to Susan Nelligan Breen, two children, Peter Joseph (16) and Philip Vincent (14)

# EXHIBIT B

1  PAUL L. GALE, SBN 065873
   paul.gale@troutmansanders.com
2  EDWARD S. KIM, SBN 192856
   edward.kim@troutmansanders.com
3  LAUREN SHAW GROCHOW, SBN 293601
   lauren.grochow@troutmansanders.com
4  TROUTMAN SANDERS LLP
   5 Park Plaza, Suite 1400
5  Irvine, CA 92614-2545
   Telephone: 949.622.2700
6  Facsimile: 949.622.2739

7  Attorneys for Plaintiffs
   BILL A. BUSBICE, JR., OLLAWOOD
8  PRODUCTIONS, LLC, and ECIBSUB, LLC

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                   WESTERN DIVISION

12  BILL A. BUSBICE, JR., an individual;      Case No. CV 16-8511
    OLLAWOOD PRODUCTIONS, LLC, a
13  limited liability company; and            **SECOND AMENDED
    ECIBSUB, LLC, a limited liability         COMPLAINT FOR:**
14  company,
                                              1. **CIVIL CONSPIRACY;**
15            Plaintiffs,
                                              2. **AIDING AND ABETTING;**
16       v.
                                              3. **IMPOSITION OF A
17  ADRIAN VUCKOVICH, an individual;             CONSTRUCTIVE TRUST;**
    COLLINS, BARGIONE &
18  VUCKOVICH, a partnership; and DOES       4. **NEGLIGENCE;**
    1 – 10, inclusive,
19                                            5. **BREACH OF FIDUCIARY
              Defendants.                        DUTY**
20
                                              **DEMAND FOR JURY TRIAL**
21

22

23

24

25

26

27

28

   30076176
   ────────────────────────────────────────
                 SECOND AMENDED COMPLAINT

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Plaintiffs Bill A. Busbice, Jr. ("Busbice"), Ollawood Productions, LLC, formerly known as Olla Productions, LLC ("Ollawood"), and Ecibsub, LLC ("Ecibsub") (collectively, "Plaintiffs"), allege:

## NATURE OF THE ACTION

1.   During a nine month span, a group of con men – led primarily by Steven J. Brown ("Brown"), James David Williams ("Williams") and Stuart Manashil ("Manashil") – planned and executed an elaborate conspiracy to swindle Plaintiffs out of almost $11,000,000 by using falsified bank records, fake agreements, fictitious people and scores of outright lies and misrepresentations to induce Plaintiffs to invest in four feature films (hereinafter, the "Conspiracy"). Defendant Collins Bargione & Vuckovich, an Illinois law firm, ("CBV"), and one of its partners, defendant Adrian Vuckovich ("Vuckovich") participated in the Conspiracy and furthered its objectives by using CBV's client trust account to launder a portion of the fraud proceeds.  Although the spokes of the Conspiracy spread across a number of states, the hub of the Conspiracy that is the subject of this action was firmly rooted in California, and its epicenter was Los Angeles.

2.   The ringleaders of the Conspiracy (Brown, Williams and Manashil) reside in Los Angeles County, and they used the Hollywood film industry as the backdrop to lure potential investors with lucrative investment opportunities to invest in the production and marketing of feature films.  In all, the extensive fraud involved four films:  *Made in America, The Letters, Left Behind,* and *Angels Sing.* Although there were some differences in how the scheme for each film was structured, the basic concept was the same:  one or more of the co-conspirators, who held themselves out as experienced film industry insiders, claimed to have a deal in place to fund the production or marketing of a feature film.  Plaintiffs were told that investing in each deal would bring a guaranteed return of capital, interest, and lucrative profit participation rights.  One or more of the co-conspirators falsely represented that they had already invested millions of their own money in each film

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

(and/or that other sophisticated investors were involved), that more capital was needed, and that Plaintiffs could take advantage of the lucrative deal by investing their own money.

3.     As part of the ruse, the co-conspirators held themselves out as experienced Hollywood film producers, executives and financiers and arranged for Busbice to meet in Beverly Hills with Manashil, an agent at a prestigious Hollywood talent agency, to bolster their Hollywood connections and credentials. To monetize their Conspiracy, the co-conspirators set up and controlled a network of bank accounts and shell companies in Los Angeles – and used falsified monthly bank statements from those accounts – to induce Plaintiffs to transfer money to the co-conspirators.

4.     Although the bank statements provided to Busbice were fake, the accounts themselves were very much real, and the co-conspirators used them to receive, convert and abscond with the investment funds Plaintiffs transferred to them.  To launder a portion of their fraud proceeds, the co-conspirators transferred or deposited hundreds of thousands of dollars – directly traceable to Plaintiffs' funds wired into the co-conspirators' Los Angeles bank accounts – into CBV's client trust account in Chicago.  Almost immediately, most of those proceeds were re-directed or returned back to the co-conspirators, who re-deposited those funds into their Los Angeles bank accounts and used those proceeds to purchase personal assets in Los Angeles.  Thus, the co-conspirators used Los Angeles as their base of operation, the Conspiracy began and ended in Los Angeles, and the proceeds of the Conspiracy flowed through and returned to Los Angeles.

5.     For their part, Defendants CBV and Vuckovich used their respective positions as an ostensible law firm and licensed attorney to serve as critical members and aiders and abettors of the Conspiracy to defraud Plaintiffs.  Defendant CBV was the gatekeeper of the stolen funds.  More specifically, Vuckovich and CBV (by and through Vuckovich) knowingly allowed hundreds of thousands of

- 2 -

SECOND AMENDED COMPLAINT

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   dollars traceable to Plaintiffs' investment funds to pass through CBV's purported
2   client trust account, often in the form of cashier's checks, to compensate the co-
3   conspirators for their fraudulent dealings with Plaintiffs, so that the fact and
4   fraudulent nature of the transfers might be cloaked behind a purported attorney-
5   client relationship and privilege.  Defendants also received for themselves
6   significant amounts of money traceable to Plaintiffs' investment funds for their role
7   in furthering the fraud and conversion.

8          6.     As co-conspirators, the liabilities of defendants CBV and Vuckovich
9   are not limited to their individual acts in furtherance of the Conspiracy but, in fact,
10  encompass all of the damage and harm Plaintiffs suffered as a result of the
11  Conspiracy.  Each participant in a conspiracy is responsible as a joint tortfeasor for
12  all damages ensuing from the underlying wrong, regardless of the degree of his or
13  her individual activity in furtherance of the conspiracy; and the act of one during
14  the conspiracy is the act of all if done in furtherance of the conspiracy.  The vast
15  majority of the events and/or omissions giving rise to Plaintiffs' claims in this
16  action, for which defendants CBV and Vuckovich may be held liable, occurred in
17  Los Angeles, and most of the key witnesses and much of the evidence underlying
18  the Conspiracy are located in Los Angeles.  In stark contrast, there are no material
19  non-party witnesses located in the Northern District of Illinois.

20         7.     Defendants are also independently liable in this action for breaches of
21  their duties of care and of their fiduciary duties owed to their client, Luxe One, Inc.
22  ("Luxe One"), one of the vehicles through which the Conspiracy operated.  CBV
23  and Vuckovich independently breached their duties to their client Luxe One, a
24  California corporation, were engaged in such representation in California, and a
25  substantial part of the events giving rise to Plaintiffs' claims for negligence and
26  breach of fiduciary duty occurred in Los Angeles.  All right, title and interest in
27  Luxe One has been assigned to Plaintiff Ollawood as part of a settlement with the
28  co-conspirators.  At the same time that CBV and Vuckovich were secretly passing

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

SECOND AMENDED COMPLAINT

the fraudulently obtained funds through their trust account, CBV and Vuckovich also served as Luxe One's attorney, doing business in Los Angeles and representing Luxe One in proceedings pending in Los Angeles, described below.

8.     CBV and Vuckovich represented the co-conspirators throughout the relevant time period.  During the course of that representation, CBV and Vuckovich were plainly made aware of all of the facts and details evidencing that all of the money invested in Luxe One was fraudulently obtained from the Plaintiffs, and that Brown and Williams had been systemically and fraudulently converting those funds from Luxe One's JP Morgan Chase ("Chase") bank account in Los Angeles for their own unauthorized and personal uses.  Indeed, six million dollars of Plaintiffs' funds were paid into Luxe One's Los Angeles bank account as a result of the fraud, almost all of which was stolen with the assistance of CBV and Vuckovich while they served as Luxe One's counsel.  Nonetheless, CBV and Vuckovich continued to hold and to transfer to the co-conspirators large amounts of money from Luxe One's Chase bank account.

9.     At the same time that CBV and Vuckovich represented Luxe One, CBV and Vuckovich played an integral role in representing other parties with patently conflicting interests and then failed to disclose to Plaintiff Ollawood, as a significant shareholder of Luxe One, about the scheme to defraud Plaintiffs and siphon off all of Luxe One's money, all to Ollawood's and Luxe One's detriment.

10.     Plaintiffs now bring this lawsuit against CBV and Vuckovich for their participation in the Conspiracy, for the knowing and substantial assistance they gave to the co-conspirators in carrying out their fraudulent scheme, for CBV's and Vuckovich's unjust receipt of portions of Plaintiffs' investment funds, and for CBV's and Vuckovich's breaches of duty to CBV's California client, Luxe One.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1332 (diversity), because the matter in controversy exceeds the

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1  sum of $75,000, exclusive of interest and costs and is between citizens of different

2  states.

3      12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2),

4  because a substantial part of the events or omissions giving rise to Plaintiffs' claims

5  occurred in this district.  Plaintiffs previously filed a lawsuit arising out of the same

6  Conspiracy in this district in an action captioned *Busbice, et al. v. Williams, et al.*,

7  Case No. 2:14-cv-04077-PA-AJW (hereinafter, "*Busbice I*").  Plaintiffs obtained

8  judgments in that action against Williams, Brown and co-conspirator Gerald

9  Seppala ("Seppala") for their roles in the Conspiracy.  The present action seeks to

10  hold defendants CBV and Vuckovich liable for their active and brazen participation

11  in that same Los Angeles-based Conspiracy, and much of the same events giving

12  rise to the claims in the *Busbice I* action, which was before this Court, also are the

13  subject of the claims in this action and occurred in this district.

14      13.    As alleged in greater detail below, Plaintiffs contend that CBV and

15  Vuckovich joined in and furthered the Conspiracy to defraud and deceive them and

16  to abscond with their funds.  A substantial part of the events giving rise to

17  Plaintiffs' claims occurred in Los Angeles, and each co-conspirator is responsible

18  as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether

19  or not he was a direct actor and regardless of the degree of his activity.  Similarly,

20  the aiding and abetting theory of liability renders a defendant liable for all damages

21  proximately caused by the tortious conduct that defendant aided and abetted.

22  Accordingly, in a conspiracy to commit fraud, one member of a civil conspiracy is

23  liable for the fraudulent misrepresentations of another.

24      14.    Plaintiffs allege three claims relating to the Conspiracy: (1) for civil

25  conspiracy; (2) aiding and abetting fraud, conversion and fraudulent transfers; and

26  (3) for imposition of a constructive trust.  Plaintiffs seek to hold CBV and

27  Vuckovich liable for their participation in the Conspiracy and for all damages the

28  Conspiracy caused.  As alleged elsewhere, while CBV's office is located in Illinois

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    and Vuckovich is a resident of Illinois, the underlying Conspiracy that is the subject

2    of the claims against them had its nucleus in Los Angeles and a substantial part of

3    the Conspiracy's events took place in the Central District.

4         15.    In addition, CBV and Vuckovich independently breached their duties

5    to their client Luxe One (a California corporation) by participating in the laundering

6    of stolen funds, they were engaged in representing Luxe One in California, and a

7    substantial part of the events giving rise to Plaintiffs' claims for negligence and

8    breach of fiduciary duty occurred in Los Angeles.

9         16.    In sum, three of the five key members of the Conspiracy, including the

10   three ringleaders, reside in and are domiciled in Los Angeles.  In addition, two of

11   the three entities used in the Conspiracy to receive Plaintiffs' investment funds are

12   California companies with their principal place of business in Los Angeles.

13   Further, at least three of the five companies that were used to transfer and abscond

14   with Plaintiffs' investment proceeds are California companies with their principal

15   place of business in Los Angeles.  And finally, all of the non-party witnesses reside

16   in California.

17        17.    Accordingly, the Central District of California is the proper venue for

18   this action.

19                              **THE PARTIES**

20        18.    Plaintiff Busbice is an individual domiciled and residing in Wyoming.

21        19.    Plaintiff Ollawood is a Louisiana limited liability company.  Busbice is

22   Ollawood's sole member.

23        20.    Plaintiff Ecibsub is a Louisiana limited liability company.  Ecibsub's

24   members are:  Busbice; Dorothy Elizabeth Lippman Busbice, an individual

25   domiciled and residing in Wyoming; and Rebecca T. Romero, an individual

26   domiciled and residing in Louisiana, as Trustee for the Ryan Alfred Busbice Family

27   II Trust, the William Matthew Busbice Family II Trust, and the Sarah Elizabeth

28   Family II Trust.  None of these trusts are Illinois trusts.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

SECOND AMENDED COMPLAINT

21. Defendant Vuckovich is an individual domiciled and residing in Illinois, who resides in Illinois, maintains an office and place of business at North LaSalle Street, Chicago, IL 60602, and receives mail at that office.

22. Defendant CBV is an Illinois partnership, whose partners are Vuckovich and Christopher Bargione.

23. Bargione is an individual domiciled and residing in Illinois who resides in Illinois, maintains an office and place of business at North LaSalle Street, Chicago, IL 60602, and receives mail at that office.

24. The true names and capacities, whether individual, corporate, or otherwise, of the defendants sued herein as DOES 1 through 10, inclusive, are unknown to Plaintiffs. Therefore, Plaintiffs sue the DOE defendants by such fictitious names. Plaintiffs will amend this complaint to show the true names and capacities of the DOE defendants when they have been ascertained. Plaintiffs are informed and believe, and on that basis allege, that DOES 1 through 10, inclusive, and each of them, are in some manner liable to Plaintiffs.

25. Plaintiffs are informed and believe, and on that basis allege, that at all times herein mentioned, defendants, and each of them, were the agents, trustees, partners, joint venturers, co-conspirators, contractors and/or employees of the other defendants, and that the acts and omissions herein alleged were done by them, acting individually, through such capacity and within the scope of their authority, and with the permission and consent of the other defendants and/or were thereafter ratified by each of the other defendants, and that each of them are jointly and severally liable to Plaintiffs.

## THE FRAUDULENTLY INDUCED INVESTMENTS AND CONVERSION OF PLAINTIFFS' FUNDS
### The First Phase of the Conspiracy Begins

26. Plaintiff Busbice was first targeted in April 2013 when co-conspirator Seppala approached him regarding an opportunity to invest in a feature length

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

documentary, *Made in America*. Co-conspirator Brown (who is a resident of Los Angeles) and Seppala were represented to be the film's producers. At that time, Plaintiff Busbice was introduced to co-conspirator Williams (another Los Angeles resident), who was represented to be a prominent Hollywood executive and financier. Together, Seppala and Williams solicited an investment through the purchase of membership units in an entity organized as the film's project management, development and financing entity known as Visions, LLC.

27. Seppala and Williams represented to Busbice that the minimum financing needed for the documentary was $1,000,000, and that Williams already had invested $500,000 of his own money. They looked to Busbice to invest the remaining $500,000. To further the fraud and to induce Busbice to invest in the project, Seppala sent Busbice an e-mail attaching a purported wire confirmation reflecting that Williams transferred $500,000 from an account in California to the Visions account. On the same day that Busbice wire transferred his $500,000 into the Visions account, and unbeknownst to Plaintiff Busbice, $450,000 of Plaintiffs' money was immediately transferred out to another Chase account in California held in the name of a shell company Williams controlled named Legacy Film Crest, LLC (which is a California LLC with its principal place of business in Los Angeles). Another $35,000 was transferred within days, so that $485,000 of the $500,000 was rerouted to California for personal uses unrelated to Busbice's investment. As alleged below, it was not until more than one year later that Plaintiffs began to discover that the *Made in America* investment was a complete sham, and Plaintiffs' money which he had transferred to a Chase bank account in Los Angeles simply was stolen.

## The Co-Conspirators Fraudulently Induce Further Investments in Additional Feature Films

28. Prior to the discovery of their first fraud and emboldened by their success, the co-conspirators staged an elaborate scam in Los Angeles and

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

maneuvered over the next nine months to fraudulently induce Plaintiffs to part with an additional $10,400,000 in what turned out to be a series of bogus investments. In June 2013, Williams solicited Busbice regarding an investment opportunity to invest in a feature film about the life of Mother Teresa (called *The Letters*). Williams represented that he had an agreement in place with the owner and producer of *The Letters* (who is located in the Los Angeles area), to make a $10,000,000 prints-and-advertising ("P&A") loan for the film. The loan was to be repaid with interest from the film's net revenues, and was to be secured in a first position by such revenues.

29.   Williams told Busbice that Luxe One (a California corporation with its principal place of business in Los Angeles) already had received $6,000,000 from an entity named Chart Investment Fund CV12 ("Chart") (purportedly based in California) and that Williams himself had already contributed $2,000,000 of his own money to Luxe One. Busbice was told that his $2,000,000 investment would complete the $10,000,000 needed to take advantage of Luxe One's lucrative P&A agreement on *The Letters*. To support these representations, Williams delivered a falsified bank statement to Busbice showing more than $8,000,000 in Luxe One's Chase bank account in Los Angeles. Later that day, in direct reliance upon Williams' representations, Busbice wire transferred $2,000,000 to the Luxe One bank account with that Chase bank in Los Angeles.

30.   Luxe One's purported deal with the owner/producer of *The Letters* also served as the basis for the next $4,000,000 investment that the co-conspirators fraudulently induced. Specifically, in November 2013, Williams represented that because *The Letters* was viewed as such a strong film, he, on Luxe One's behalf, negotiated a new deal to loan up to $22,000,000 (instead of the original $10,000,000) for the film's P&A spend on far more lucrative terms than the existing deal. Williams represented that both he and Chart had already contributed

- 9 -

SECOND AMENDED COMPLAINT

an additional $4,000,000 each, and therefore, an additional $4,000,000 was needed from Busbice/Ollawood.

31. To fraudulently induce this $4,000,000 "investment," Williams, among other things, provided Plaintiffs with a purported Chase online statement showing Luxe One's account balance as of December 17, 2013 to be $18,014,609.46 to make it appear as if he and Chart had actually contributed millions to Luxe One. On January 2, 2014, in direct reliance on the various representations Williams made, including the purported 12/17 Luxe One balance statement, Busbice, through Ollawood, wire-transferred $4,000,000 to Luxe One's Chase bank account in Los Angeles.

32. The co-conspirators obtained another $2,000,000 in a similar P&A loan scheme on October 30, 2013 when Busbice, through Ollawood, transferred that amount to an account held by Moment Factory, LLC (a California limited liability company with its principal place of business in Los Angeles), a special purpose entity that Williams purportedly set up to make a lucrative $4,000,000 P&A loan for *Angels Sing*, a Christmas-themed feature film starring Harry Connick Jr., Willie Nelson and others. Williams again represented that he had already invested $2,000,000 in Moment Factory, and that if Busbice invested the remaining $2,000,000 needed, then the two would be equal partners in the deal. Once again, Williams provided a falsified bank record to show that there was $1,903,150.24 in Moment Factory's Chase account as of October 28, 2013 due to Williams' contribution, when in reality there was $0 in the account. And once again, genuine Chase bank records Plaintiffs obtained in April 2014 show that no one but Plaintiffs ever put any money into the Moment Factory/*Angels Sing* deal. Plaintiffs' money was fraudulently transferred among the co-conspirators and spent on various unauthorized items, including personal and luxury items, such as cars, boats, vacations, real estate, private school tuition, etc.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

33.    In August 2013, Williams fraudulently induced Busbice to part with $2,400,000 in connection with a purported $15,000,000 production loan for *Left Behind* (a feature length film starring Nicholas Cage), the remainder of which Williams represented he was funding through his own purported P&A fund. Williams' purported P&A fund was a complete fabrication, and Williams never invested any of his or his bogus fund's own money, but rather misappropriated a portion of Plaintiffs' money from the Luxe One transaction. No part of the $2,400,000 invested has been recovered.

## The Conspiracy is Uncovered and Genuine Bank Records Reveal the Massive Extent of the Fraud

34.    More than one year after Plaintiffs invested in the first project solicited by the co-conspirators (the *Made in America* project), Plaintiffs began to discover that the purported film projects were a sham. Specifically, Plaintiffs discovered that the *Made in America* project was a ruse to fraudulently solicit Plaintiffs' investment, and no real work was ever done on that purported film project. Approximately one year after being fraudulently induced to invest in the *Made in America* project through purported wire confirmations reflecting that co-conspirator Williams had transferred $500,000 of his own funds to a Chase bank account to fund the project, Plaintiffs obtained, for the first time, genuine Chase bank records showing, among other things, that:  (a) the wire confirmations and bank records previously provided were altered; (b) Plaintiffs' $500,000 was the only money ever "invested" in the purported project; (c) Plaintiffs' investment funds were quickly transferred to other accounts under one or more of the co-conspirators' control, and thereafter converted by the co-conspirators for their own unauthorized and wrongful use.

35.    As with the *Made in America* project, the Luxe One deal was a complete hoax – but on a much larger scale. Plaintiffs obtained genuine Chase bank records in April 2014 showing that neither Williams nor Chart ever put any

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

money into Luxe One, and that only $112,945.09 was in the Luxe One account on December 17, 2013 (the small remainder of Plaintiffs' earlier $2,000,000 investment in July 2013), and not $18,014,609.46 as had been represented. And as with the *Made in America* investment, the genuine bank records obtained from Chase show that the $6,000,000 Busbice/Ollawood invested in Luxe One was fraudulently transferred and spent by and among the co-conspirators, with the aid and assistance of CBV and Vuckovich.

36.     As the records Chase produced confirm, there were two Chase accounts held in the name of Luxe One. Both of those accounts were maintained in a Chase Los Angeles County office (located in Chatsworth). One ends in 2939 and is referred to as the "Luxe One 2939 Account." The Luxe One 2939 Account was the disclosed corporate account and the one into which Plaintiffs wire transferred their funds as instructed. The other Luxe One account, which at all times was concealed from Plaintiffs, ends in 1572 and is referred to as the "Luxe One 1572 Account."

37.     Records Chase produced confirm that more than $1 million flowed into the secret Luxe One 1572 Account directly from either the Luxe One 2939 Account or another Chase account that the co-conspirators controlled, both of which Plaintiffs funded exclusively. Chase's records also confirm that Brown had control over the Luxe One 1572 Account and that he brazenly used the money in that account for his own personal use and enjoyment and signed for and made repeated withdrawals and transfers of substantial sums of money during the year that the account was active.

38.     As alleged below, among the transfers Brown made from the Luxe One 1572 Account were transfers of at least $285,000 to CBV's client trust account. Other transfers made by Brown to one or more shell companies also were later transferred to CBV.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

- 12 -

SECOND AMENDED COMPLAINT

## Defendants CBV's and Vuckovich's Furtherance of the
## Conspiracy and Conversion

39.  From May 2013, shortly after the co-conspirators fraudulently obtained the first $500,000 of Plaintiffs' investment funds, until at least June 2014, CBV and Vuckovich received hundreds of thousands of dollars traceable to Plaintiffs' fraudulently induced investment funds from accounts controlled by Williams and/or Brown.  Based on bank records obtained to date, the total amount of such funds CBV and Vuckovich received is believed to be at least $473,000.

40.  As alleged above, most, if not all of these transfers to CBV and Vuckovich, were of funds from bank accounts held in Los Angeles by entities based in Los Angeles.  A recent criminal indictment filed by the United States of America against Williams, Brown and Seppala in the United States District Court for the Southern District of New York (the "Indictment") contains three counts:  (1) Conspiracy to commit wire fraud; (2) Wire fraud; and (3) Conspiracy to commit money laundering.  The Indictment alleges, among other things, that after Williams transferred "fraudulently obtained funds" to an account Williams and Brown held jointly, Brown then disbursed such funds from the joint account "to different parties unrelated to the film projects for which that money was given, including sending more than $200,000 to a law firm with whom BROWN works[.]"  (*United States v. Williams, et al.*, Case No. 1:16-cr-00436-KMW (S.D.N.Y.), Dkt. 1 at ¶16.) Plaintiffs are informed and believe and based thereon allege that the law firm referenced in the Indictment is CBV, and the joint account referenced in the Indictment is the Chase Luxe One bank account located in Los Angeles.

41.  A significant amount of the funds CBV and Vuckovich received was parked with CBV or Vuckovich until later withdrawn from CBV's purported client trust account, and then funneled to others, such as the Hollywood talent agent Manashil who, like CBV and Vuckovich, conspired with, aided and abetted Williams and Brown in carrying out their scheme.  There were several of these

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

- 13 -

fraudulent "pass through" transfers, which occurred over the course of more than one year, beginning after the first of the four above-alleged film investment scams.

42.    Plaintiffs are informed and believe, and on that basis allege, that a primary goal of these pass through transfers was to conceal the illegitimate origins of the fraudulently obtained funds, as well as the fact and the fraudulent nature of the transfers to the co-conspirator-transferees, with the cloak of a purported attorney-client relationship and privilege, and to otherwise avoid disclosure and regulations applicable to financial institutions. Plaintiffs are informed and believe, and on that basis allege, that Defendants CBV and Vuckovich knew that the amounts that they received were ill-gotten proceeds of fraudulent and criminal activity, and actively assisted in the diversion of these funds.  Alternatively, Defendants CBV and Vuckovich consciously disregarded a high probability that the funds they received were such ill-gotten proceeds, and continued to assist the fraudsters' efforts to hide and fraudulently transfer the misappropriated funds.

43.    Most, if not all, of the funds transferred to CBV and Vuckovich in Illinois came from bank accounts located in Los Angeles and most, if not all, of the ultimate transferees of the pass through transfers were Los Angeles residents.

44.    Plaintiffs are informed and believe, and on that basis allege, that these fraudulent pass through transfers do not appear to have any legitimate business purpose and were carried out primarily to conceal and further the co-conspirators' fraud and conversion of Plaintiffs' invested funds.  A significant amount of the fraudulently obtained investment funds CBV and Vuckovich received was given to and retained by them in accounts that were opened to implement the fraudulent scheme, and otherwise paid out of Los Angeles companies from their Los Angeles banks.  CBV and Vuckovich received this money in furtherance of aiding and abetting the above-alleged fraud and conversion of Plaintiffs' investment funds, and not for any legitimate or bona fide rendering of professional services.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

## DEFENDANTS CBV AND VUCKOVICH'S BREACHES OF
## DUTY OWED TO LUXE ONE

45. As of April 24, 2014, Defendants CBV and Vuckovich had at least $100,000 remaining in their purported client trust account (the "Remaining Cash"), which they knew Brown had been deposited with CBV in the form of Chase bank cashiers' checks.

46. Throughout the relevant time period, Defendants CBV and Vuckovich represented Luxe One as its attorneys. Their representation of Los Angeles-based Luxe One included, but was not limited to: (1) commencing an arbitration in Los Angeles, California on Luxe One's behalf against Big Screen Partners V, Ltd. in June 2014 and representing Luxe One in connection with that arbitration, which revolved around the movie *The Letters*; (2) counseling Luxe One regarding Plaintiffs' lawsuit filed on May 28, 2014 against certain of the co-conspirators including Williams, Brown, Seppala and Luxe One (the *Busbice I* action); and (3) negotiating potential settlements of *Busbice I*.

47. By mid-June 2014, Defendants CBV and Vuckovich, as part of their representation of Luxe One and others, received a copy of the complaint filed in *Busbice I*, which contained extremely detailed allegations of the co-conspirators fraud and conversion of the fraudulently obtained funds through accounts Brown and Williams controlled, specifically including Chase Los Angeles bank accounts in the name of Luxe One. Plaintiffs are informed and believe, and on that basis allege, that by mid-June 2014, Defendants CBV and Vuckovich were in possession of genuine Chase bank account statements for Luxe One's accounts evidencing the co-conspirators' fraud and Brown's and Williams' fraudulent conversion of the fraudulently obtained funds from the Luxe One accounts for their own illegitimate, unauthorized and personal uses.

48. On August 26, 2014, despite their knowledge of facts showing that the Remaining Cash Brown deposited was diverted from Luxe One's Chase bank

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

30076176

- 15 -

SECOND AMENDED COMPLAINT

account and had been fraudulently obtained from Plaintiffs, Defendants CBV and Vuckovich intentionally, recklessly or at least negligently transferred the Remaining Cash to Hollywood talent agent Manashil, one of the co-conspirators in the fraudulent scheme.

49. At the same time that Defendants CBV and Vuckovich represented Luxe One, they also represented other persons, including, but not limited to Brown, with interests that patently and materially conflicted with Luxe One's interests.

50. Defendants CBV and Vuckovich also failed to fully, timely and properly disclose relevant information about the above-alleged scheme to defraud Plaintiffs to Luxe One and otherwise facilitated the waste and looting of Luxe One's assets, causing substantial harm to Luxe One and to Plaintiffs.

51. Effective as of August 1, 2016, Luxe One assigned to Plaintiff Ollawood all of its rights, claims and causes of action, including those against CBV and Vuckovich.

## FIRST CLAIM FOR RELIEF

**For Civil Conspiracy to Defraud and to Convert and Fraudulently Transfer Plaintiffs' Investment Funds**

**(Against all Defendants)**

52. Plaintiffs repeat and incorporate herein by this reference paragraphs 1 through 51, inclusive, as if fully set forth herein.

53. Plaintiffs are informed and believe, and on that basis allege, that the co-conspirators and CBV and Vuckovich, and each of them, knowingly and willfully conspired and agreed among themselves to:

    a) fraudulently induce Plaintiffs to make the above-alleged investments totaling $10,900,000;

    b) convert the fraudulently obtained funds for their and their co-conspirators' personal use and benefit, while actively concealing the fraud; and

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

    c)   fraudulently transfer the ill-gotten proceeds out of Plaintiffs' reach with the intent to hinder, delay and defraud Plaintiffs in their efforts to discover the fraud, recoup their investments and obtain relief.

54.   As alleged, and with CBV's and Vuckovich's aid and assistance, the co-conspirators did, in fact, fraudulently induce Plaintiffs to make these investments by intentionally misrepresenting material facts regarding the investments; convert much of the fraudulently obtained funds for their and their co-conspirators' personal use and benefit; and fraudulently transfer such funds out of Plaintiffs' reach.

55.   Plaintiffs are informed and believe, and on that basis allege, that Vuckovich and CBV furthered the conspiracy by, *inter alia*, knowingly allowing hundreds of thousands of dollars traceable to Plaintiffs' investment funds to pass through CBV's purported client trust account to compensate the co-conspirators for their fraudulent dealings with the Plaintiffs so that the fact and fraudulent nature of the transfers might be cloaked behind a purported attorney-client relationship and privilege.

56.   As a direct and proximate result of the above-alleged conspiracy and wrongful acts, Plaintiffs have sustained millions of dollars in damages, the exact sum to be proven at trial, but believed to be in excess of $10,000,000.

57.   Defendants' conduct, as herein alleged, was done willfully and with a conscious disregard of Plaintiffs' rights and with intent to injure, so as to constitute oppression, fraud and/or malice under California Civil Code section 3294, entitling Plaintiffs to punitive damages.

## SECOND CLAIM FOR RELIEF

**For Aiding and Abetting Fraud, Conversion, and Fraudulent Transfers**

**(Against all Defendants)**

58.   Plaintiffs repeat and incorporate herein by this reference paragraphs 1 through 57, inclusive, as if fully set forth herein.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

59.     Plaintiffs are informed and believe, and on that basis allege, that alternatively, even if CBV and Vuckovich did not conspire as alleged, these defendants are liable for aiding and abetting the fraud and conversion perpetrated by the co-conspirators, because CBV and Vuckovich had knowledge of the above-alleged conspiracy, fraud and conversion, and provided the perpetrators substantial assistance in accomplishing the tortious result by, *inter alia*, allowing hundreds of thousands of dollars traceable to Plaintiffs' investment funds to pass through CBV's purported client trust account to compensate co-conspirators for their fraudulent dealings with the Plaintiffs so that the fact and fraudulent nature of the transfers might be cloaked behind a purported attorney-client relationship and privilege.

60.     Defendants' substantial assistance furthered the perpetrators' scheme, and as a direct and proximate result of defendants' assistance, Plaintiffs have sustained millions of dollars in damages, the exact sum to be proven at trial, but believed to be in excess of $10,000,000.

61.     Defendants' conduct, as herein alleged, was done willfully and with a conscious disregard of Plaintiffs' rights and with intent to injure, so as to constitute oppression, fraud and/or malice under California Civil Code section 3294, entitling Plaintiffs to punitive damages.

## THIRD CLAIM FOR RELIEF

### For Imposition of a Constructive Trust

### (Against all Defendants)

62.     Plaintiffs repeat and incorporate herein by this reference paragraphs 1 through 61, inclusive, as if fully set forth herein.

63.     As alleged, the co-conspirators, with defendants' assistance, fraudulently induced Plaintiffs to transfer a total of $10,900,000 for certain purported investments, by intentionally misrepresenting material facts regarding the investments and actively concealing the truth regarding the investments and the

unauthorized use of the investment funds, so that the co-conspirators could convert Plaintiffs' funds for their own unauthorized and wrongful use and enjoyment.

64. Defendants CBV, Vuckovich and Does 1-10, and each of them, received a part or parts of the converted funds, and/or received property or property interests that were acquired in exchange for such funds, for no value (or *de minimis* value) and/or with actual or constructive knowledge of the fraud.

65. By virtue of the foregoing, CBV, Vuckovich and Does 1-10 hold the funds, property and/or property interests so received by them, and all assets, property and/or property interests received in exchange for any part of such funds, property and/or property interests, as a constructive trustee for Plaintiffs' benefit.

## FOURTH CLAIM FOR RELIEF

### For Negligence

### (Against all Defendants)

66. Plaintiffs repeat and incorporate herein by this reference paragraphs 1 through 65, inclusive, as if fully set forth herein.

67. Throughout the relevant time period, defendants agreed to represent, and began representing, Los Angeles-based Luxe One as its attorneys. Such representation included, but was not limited to: (1) commencing arbitration in Los Angeles on Luxe One's behalf against Big Screen Partners V, Ltd. in June 2014 and representing Luxe One in connection with that arbitration related to *The Letters*; (2) counseling Luxe One regarding the *Busbice I* action; and (3) negotiating potential settlements of the *Busbice I* action.

68. By virtue of and through that representation, defendants owed Luxe One ordinary duties of care and professional duties of care, skill and loyalty.

69. Plaintiffs are informed and believe, and on that basis allege, that at all times thereafter, defendants breached those duties and failed to exercise reasonable care by, among other things: (i) transferring the Remaining Cash to co-conspirators in the above-alleged scheme to defraud Plaintiffs, despite knowledge of facts

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1 showing that the Remaining Cash was removed from Luxe One's Chase bank
2 account and had been fraudulently obtained from Plaintiffs; (ii) representing other
3 persons with interests that patently and materially conflicted with Luxe One's
4 interests at the same time as they represented Luxe One; and (iii) failing to fully,
5 timely and properly disclose to Luxe One relevant information about the above-
6 alleged scheme to defraud Plaintiffs.

7    70.    As a direct and proximate result of the above-alleged acts and
8 omissions, Luxe One and Plaintiffs sustained substantial damages in excess of
9 $100,000, the exact amount to be proven at trial.

10    71.    As hereinabove alleged, Luxe One has assigned this and all other of its
11 claims and causes of action to Plaintiff Ollawood, and Ollawood brings this cause
12 of action as Luxe One's assignee.

**FIFTH CLAIM FOR RELIEF**

**For Breach of Fiduciary Duty**

**(Against all Defendants)**

16    72.    Plaintiffs repeat and incorporate herein by this reference paragraphs 1
17 through 71, inclusive, as if fully set forth herein.

18    73.    Throughout the relevant time period, defendants CBV and Vuckovich
19 agreed to represent, and began representing, Luxe One as its attorneys.

20    74.    By virtue of and through that representation, defendants CBV and
21 Vuckovich were fiduciaries of Luxe One and owed it the highest duty of good faith,
22 due care and loyalty.

23    75.    Plaintiffs are informed and believe, and on that basis allege, that by the
24 acts and omissions alleged herein, defendants CBV and Vuckovich breached that
25 fiduciary duty by, among other things: (i) transferring the Remaining Cash to co-
26 conspirators in the above-alleged scheme to defraud Plaintiffs, despite knowledge
27 of facts showing that the Remaining Cash was removed from Luxe One's Chase
28 bank account and had been fraudulently obtained from Plaintiffs; (ii) representing

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

30076176

SECOND AMENDED COMPLAINT

other persons with interests that patently and materially conflicted with Luxe One's interests at the same time as they represented Luxe One; and (iii) failing to fully, timely and properly disclose to Luxe One relevant information about the above-alleged scheme to defraud Plaintiffs.

76. As a direct and proximate result of the above-alleged acts and omissions, Luxe One and Plaintiffs sustained substantial damages in an amount to be proven at trial.

77. Defendants CBV and Vuckovich's conduct, as herein alleged, was done willfully and with a conscious disregard of Plaintiffs' and Luxe One's rights and with intent to injure, so as to constitute oppression, fraud and/or malice under California Civil Code section 3294, entitling Plaintiffs to punitive damages.

78. As hereinabove alleged, Luxe One has assigned this and all other of its claims and causes of action to Plaintiff Ollawood, and Ollawood brings this cause of action as Luxe One's assignee.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment, as follows:

## **FIRST CLAIM FOR RELIEF**

1. For compensatory damages in an amount to be proven at trial, but believed to be in excess of $10,000,000;

2. For exemplary or punitive damages in an amount to be proven at trial;

3. For costs and expenses incurred in this litigation; and

4. For such other and further relief as this Court deems just and proper.

## **SECOND CLAIM FOR RELIEF**

5. For compensatory damages in an amount to be proven at trial, but believed to be in excess of $10,000,000;

6. For exemplary or punitive damages in an amount to be proven at trial;

7. For costs and expenses incurred in this litigation; and

8. For such other and further relief as this Court deems just and proper.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

## THIRD CLAIM FOR RELIEF

9.    For imposition of a constructive trust on all funds and property received by defendants CBV and Vuckovich derived, directly or indirectly, from the moneys invested by Plaintiffs, and on any and all proceeds, assets, property and/or other property interests received or acquired by CBV and Vuckovich from any use or transfer of such property and amounts;

10.    For costs and expenses incurred in this litigation; and

11.    For such other and further relief as this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

12.    For compensatory damages in an amount to be proven at trial;

13.    For costs and expenses incurred in this litigation; and

14.    For such other and further relief as this Court deems just and proper.

## FIFTH CLAIM FOR RELIEF

15.    For compensatory damages in an amount to be proven at trial;

16.    For exemplary or punitive damages in an amount to be proven at trial;

17.    For costs and expenses incurred in this litigation; and

18.    For such other and further relief as this Court deems just and proper.

Dated: January 9, 2017          TROUTMAN SANDERS LLP

By: /s/ Paul L. Gale
Paul L. Gale
Edward S. Kim
Lauren Shaw Grochow

Attorneys for Plaintiffs
BILL A. BUSBICE, JR.,
OLLAWOOD PRODUCTIONS,
LLC, and ECIBSUB, LLC

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

# JURY DEMAND

Plaintiffs demand trial by jury on all issues and claims so triable.

Dated:  January 9, 2017                   TROUTMAN SANDERS LLP


By:  /s/ Paul L. Gale
             Paul L. Gale
             Edward S. Kim
             Lauren Shaw Grochow

             Attorneys for Plaintiffs
             BILL A. BUSBICE, JR.,
             OLLAWOOD PRODUCTIONS,
             LLC, and ECIBSUB, LLC

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

# EXHIBIT C



COLLINS BARGIONE & VUCKOVICH
LAWYERS TRUST FUND OF ILL.
1 N LASALLE ST., STE. 300
CHICAGO, IL 60602

2475
2-202-710

PAY TO THE ORDER OF   Stuart Marshal          DATE 8/26/14   $ 100,000.00

One Hundred thousand                                              DOLLARS

FOR _____

"002475"   ":0710":   "70 1"

COLLINS BARGIONE & VUCKOVICH

COUNSELLORS AT LAW

ONE NORTH LA SALLE STREET

SUITE 300

CHICAGO, ILLINOIS 60602

GEORGE B. COLLINS
CHRISTOPHER BARGIONE
ADRIAN M. VUCKOVICH
———
BENJAMIN C. BUTLER
KATHRYNE R. HAYES

TELEPHONE (312) 372-7813

FAX (312) 372-7840

email@cb-law.com

September 17, 2014

**BY EMAIL**

Mr. John G. Burgee

Re:  Luxe One v. Big Screen Partners V, Ltd. (Arbitration)

Dear Mr. Burgee:

I spoke with David Williams yesterday regarding this matter.  It is an arbitration pending before AAA in California.

The current status of the case is that an arbitrator has been assigned.

There is a telephone conference scheduled for September 30, 2014.

The case started out with me sending a Demand for Arbitration nearly simultaneously with Big Screen's filing a Demand for Arbitration.

We did not pay the requisite fee at the time and because I am not licensed in the State of California, I could not make a further filing in the case.

I enclose our Demand for Arbitration which should be refiled, Big Screen's Demand for Arbitration and the correspondence with AAA and/or counsel for Big Screen.

My understanding is that we need to seek leave to file a counter claim to their Demand for Arbitration and then the requisite fee has to be paid to AAA before the case may proceed.

Yesterday, David Williams said to send you all of the materials so you can take over this matter, which makes more sense, given your representation in the Busbice case as well as the California location of the arbitration.  I am happy to help in any way that I can.

COLLINS BARGIONE & VUCKOVICH

COUNSELLORS AT LAW

Mr. John G. Burgee
September 17, 2014
Page 2

I will forward David Williams a copy of the bill owed to AAA in order to proceed with the case.

Please contact me with questions.

Respectfully,

Adrian Vuckovich

AV/sp
Enclosures

Vuckovich 000223

1  John M. Genga (SB# 125522)
   GENGA & ASSOCIATES, P.C.
2  15260 Ventura Boulevard, Suite 1810
   Sherman Oaks, California 91403
3  Telephone: (818) 444-4580
   Facsimile: (818) 444-4585
4
5  Attorneys for Claimant
   BIG SCREEN PARTNERS V, LTD.
6
7
8                        BEFORE THE
9            AMERICAN ARBITRATION ASSOCIATION
10
11 *In the Matter of the*        AAA Case No.
   *Arbitration Between:*
12                               ARBITRATION CLAIM OF BIG
   BIG SCREEN PARTNERS V, LTD.,  SCREEN PARTNERS V, LTD.
13
                Claimant,
14
15         vs.
16 LUXE ONE, INC. and DOES 1
   through 50, inclusive,
17
                Respondents.
18
19
20         In support of its Demand for Arbitration herein, claimant Big Screen Partners
21 V, Ltd. ("Claimant" or "Big Screen") claims as follows against respondent Luxe
22 One, Inc. ("Respondent" or "Luxe"):
23                          INTRODUCTION
24         1.    This claim arises from Respondent's material breach and repudiation
25 of its obligations under a September 16, 2013 Single Picture Prints & Advertising
26 Credit Facility Agreement between Big Screen and Luxe (the "P&A Deal"), in
27 which Luxe, among other things, agreed but failed, as a result of its own fraud and
28 theft of funds, to provide eight million dollars ($8,000,000.00) in "print and

---

ARBITRATION CLAIM OF BIG SCREEN PARTNERS V, LTD.

1  advertising" funding in support of the domestic theatrical release of a motion

2  picture based on the life of Mother Teresa entitled *The Letters* (the "Picture"). A

3  true and correct copy of the P&A Deal, which provides at page 5 thereof for

4  arbitration before this Tribunal in Los Angeles, is submitted herewith in its entirety

5  as Exhibit A hereto and incorporated in full by this reference.

6                              THE PARTIES

7       2.    Big Screen is a limited partnership organized and existing under the

8  laws of the State of California, with its principal place of business in the County of

9  Los Angeles.

10      3.    Big Screen is informed and believes and on that basis alleges that

11 Respondent Luxe is a corporation organized and existing under the laws of the State

12 of California, with its principal place of business in the County of Los Angeles.

13      4.    Big Screen does not know the true identities of the respondents named

14 herein as Does 1 through 50, inclusive, and therefore identifies those respondents

15 by such fictitious names. Among other things, Big Screen is informed and believes

16 and on that basis alleges that Luxe and its principal, J. David Williams, have

17 formed a number of entities in relation to the Picture and other entertainment

18 industry projects, that investors in Luxe have also invested in other Williams

19 entities, and that Williams has comingled and misappropriated funds of Luxe and

20 such other entities. Accordingly, adhering to the fiction of the separate identities of

21 Williams, Luxe and such other entities would perpetrate a fraud on Claimant and

22 this Tribunal, such that Williams and such other entities constitute alter egos of and

23 are liable for the malfeasance, and subject to the arbitration agreement, of Luxe as

24 herein alleged and to be proved. Big Screen is further informed and believes and

25 on that basis alleges that Luxe and the respondents named herein as Does 1 through

26 50, inclusive, acted as agents for or on behalf or under the direction and control of

27 each other, making each liable for the acts of every other, such that further

28

Vuckovich 000844

1   reference to "Luxe" or "Respondent" herein shall be deemed to include Does 1

2   through 50, inclusive.

3                          FIRST CLAIM FOR RELIEF

4                         Breach of Contract (P&A Deal)

5        5.    The P&A Deal obligated Luxe, among other things, to provide a "P&A

6   Commitment" in "the amount of $8,000,000 to be spent in print & advertising costs

7   ... based on a mutually approved marketing and distribution plan ...." Luxe

8   undertook to do this in relation to a September 5, 2014 domestic theatrical release

9   date that it had announced for the Picture ("Release Date"). However, at no time

10  did Luxe provide a "marketing and distribution plan" for the Picture to Big Screen,

11  including a draw-down schedule for expenditures for prints and advertising in

12  relation the Luxe-established Release Date, or any release date.

13       6.    In late May 2014, with the Release Date rapidly approaching, Big

14  Screen became aware of a history of fraud judgments against Williams and entities

15  created by him in connection with various entertainment industry projects, as well

16  as *pro se* bankruptcy filings that Williams made to avoid such judgments and then

17  dismissed after using such filings to bring a halt to enforcement activity. Such

18  judgments and other delinquencies appear in schedules submitted filed with the

19  Bankruptcy Court by Williams under penalty of perjury. A true and correct copy of

20  one such schedule from a 2012 Williams bankruptcy, Central District of California

21  Case No. 1:12-bk-10044-VK,[1] is submitted herewith in its entirety as Exhibit B

22  hereto and incorporated in full by this reference.

23       7.    Big Screen further became aware that, on May 28, 2014, the investor

24  who had provided $6 million of the P&A funds for the Picture filed a lawsuit

25  against Williams, Luxe and a number of other individuals and entities alleging that

26

27  [1] Big Screen became aware of at least two other Williams bankruptcy filings from public
     records of the Central District, Case Nos. 1:97-bk-22067-GM and 1:08-bk-13316-GM, in
28  1997 and 2008, respectively.

                                          3

Vuckovich 000845

1   the defendants named therein had absconded with that $6 million, as well as nearly
2   $5 million in additional funds for other projects. A true and correct copy of the
3   complaint in that action, *Busbice, et al. v. Williams, et al.*, U.S. Dist. Ct. (C.D. Cal.)
4   Cased No. CV14-4077-PA (AJWx), is submitted herewith in its entirety as Exhibit
5   C hereto and incorporated in full by this reference.

6       8.    Due to the foregoing, Big Screen became justifiably concerned about
7   Luxe's ability to fund the P&A Commitment and otherwise perform in accordance
8   with the P&A Deal. Accordingly, Big Screen demanded that Luxe immediately
9   provide a marketing and distribution plan with a detailed draw-down schedule
10  (collectively, "Plan"), and that Luxe adhere strictly to that Plan or immediately
11  escrow the full $8 million P&A Commitment in order to establish its ability to
12  perform. Big Screen further advised Luxe that its failure to provide the Plan by the
13  time demanded would constitute a material breach by Luxe of the P&A Deal and
14  result in its immediate termination.

15      9.    Luxe failed to deliver the Plan as and when demanded, or at all. Big
16  Screen, therefore, terminated the P&A Deal and notified Luxe thereof. Among
17  other things, Big Screen seeks by this arbitration a declaration affirming that the
18  P&A Deal is terminated and that Big Screen has no obligations thereunder to Luxe.

19      10.   Luxe actions and failures to act, including (i) creating its own inability
20  to perform the P&A Deal by depleting the funds comprising the P&A Commitment,
21  and (ii) failing to deliver the Plan as and when demanded, or at all, in light of its
22  obligations under the P&A Deal and the allegations of the *Busbice* action and other
23  information about Williams' prior fraudulent conduct, constituted a material breach
24  and anticipatory repudiation of the P&A Deal on the part of Luxe.

25      11.   Big Screen performed all obligations required of it under the P&A
26  Deal, except to the extent excused therefrom by the failures to perform, constituting
27  breach, on the part of Luxe.

28

4

ARBITRATION CLAIM OF BIG SCREEN PARTNERS V, LTD.

Vuckovich 000846

1    12.    As a direct and proximate result of Luxe's anticipatory repudiation and

2    material breaches of the P&A Deal, Big Screen has suffered significant damages

3    according to proof, but at this early stage believed to be well in excess of One

4    Million Dollars ($1,000,000.00).

5    13.    Pursuant to the express terms of the P&A Deal, Big Screen is further

6    entitled to recover its costs and reasonable attorneys' fees upon prevailing in this

7    proceeding.

8                            SECOND CLAIM FOR RELEIF

9                                    Fraud

10    14.    Luxe made false representations with the intent to induce Big Screen

11    to rely thereon by entering into the P&A Deal and entrusting the advertising,

12    promotion and release of the Picture to Luxe.  Among other things, Luxe

13    represented on and prior to September 16, 2013 that it could and would fund the

14    P&A Commitment for the Picture when in fact it knew that it could not or would

15    not do so, and/or with no intention of honoring its promise to do so, because Luxe

16    intended that funds for the P&A Commitment be used for purposes other than P&A

17    for the Picture, including personal luxury items for Williams.

18    15.    Big Screen had no knowledge of the falsity of Luxe's representations

19    and promises, and therefore reasonably relied on them in entering into the P&A

20    Deal and otherwise, as Luxe expected and intended.  As a direct and proximate

21    result thereof, Big Screen has suffered significant damages according to proof, but

22    at this early stage believed to be well in excess of One Million Dollars

23    ($1,000,000.00).

24    16.    Luxe acted willfully and with oppression, fraud and/or malice as those

25    terms are used in Cal. Civ. Code § 3294, entitling Big Screen to punitive damages

26    thereunder in an amount adequate to make an example of and to punish

27    Respondents for its conduct.

28

                                    5

ARBITRATION CLAIM OF BIG SCREEN PARTNERS V, LTD.

Vuckovich 000847

## PRAYER FOR RELIEF

17.  Based on the foregoing and other matters to be proved at arbitration, Big Screen prays for relief as follows:

a.  On the First Claim for Relief, for a declaration that the P&A Deal is terminated as of June 10, 2014, and that Big Screen has no obligations thereunder to Luxe;

b.  On the First and Second Claims for Relief, for damages according to proof, in excess of One Million Dollars ($1,000,000.00);

c.  On the Second Claim for Relief, for punitive damages adequate to make an example and to punish Luxe;

d.  On all Claims for Relief, for costs incurred by Big Screen in connection with this Arbitration, including its' reasonable attorneys' fees; and

e.  For such other and further relief as this Tribunal may deem just and proper.

## RESERVATION OF RIGHTS

18.  Claimant reserves the right to add additional claims, respondents and prayers for relief to the extent same have been inadvertently omitted or hereafter become known to Claimant.

DATED: June 17, 2014          GENGA & ASSOCIATES, P.C.


By:     /jmg/
          John M. Genga
          Attorneys for Claimant
          BIG SCREEN PARTNERS V, LTD.

6

Vuckovich 000848

THE LETTERS                                                           Luxe One, Inc.

# LUXE ONE, INC.
### SINGLE PICTURE PRINTS & ADVERTISING CREDIT FACILITY AGREEMENT

# "THE LETTERS"

---

**Lender/Investor:**

> Luxe One, Inc.
> 1800 Century Park East
> Sixth Floor
> Century City, CA 90067

**Borrower:**  Big Screen Partners V, Ltd.
> 8306 Wilshire Boulevard
> Beverly Hills, CA 90211

**Date:**  September 16, 2013

**Project Title:**  "The Letters" (the "Picture").

**Initial Release:**  Lender shall coordinate and utilize its best efforts through its relationships to obtain a wide simultaneous release of the Picture theatrically in the domestic market on approximately 2000 screens targeted for release within the 2014 calendar year for a period of at least three weeks. The proposed and approved currently contemplated release date is confirmed as March 5, 2014. Additionally, at Lender's expense as part of the P and A Commitment (as defined herein), Lender shall arrange a qualifying Academy release for the Picture in one theater in New York and one theater in Los Angeles in 2013 to qualify for an Academy campaign for the Picture and its Actors subject to Academy regulations and requirements.

**Advance and Purchase:**  Lender/Investor shall pay the amount of $1,750,000 as "finishing funds" to Borrower/Producer for the purchase of 35 of the 400 authorized shares of the limited partnership owning the distribution rights to the Picture (the "Shares"). Such funds to be paid: (a) $250,000 immediately following the complete execution of this agreement and (b) the balance ($1,500,000) within 30 days following the complete execution of this agreement. Borrower shall use these funds to pay off all outstanding loans, liens and encumbrances (other than customary liens in favor of guilds, labs, if any), as well as for payment of any and all future production, post-production and/or delivery costs leaving the Borrower with a free and clear Chain of Title on the Picture.

250 Park Avenue                                          1800 Century Park East
Seventh Floor                                                        Sixth Floor
New York City, New York 10177                      Century City, CA 90067

Vuckovich 000849

THE LETTERS                                                                              Luxe One, Inc.

In the event the payment set forth in (b) above is not made within the aforementioned 30 day period,
Borrower shall have the option, in its sole and absolute discretion, to terminate this agreement by notice
in writing to Lender provided Lender does not make such payment within 15 days after giving such
written notice. In the event of such termination, if ever, Lender shall retain ownership of the five (5)
Shares purchased in consideration of the $250,000 payment set forth in (a) above.

**P and A Commitment:**  Subject to satisfactory completion of the Conditions Precedent set forth below
(or waiver by Luxe One, Inc.), Lender shall provide the amount of $8,250.000 to be spent in print &
advertising costs to theatrically release the Picture in the Territory based upon a mutually approved
marketing and distribution plan (hereafter, the "Distribution Plan"). Said plan to be approved by Big
Screen Partners V, Ltd., Luxe One, Inc. and the domestic distributor ("Parties") provided that in the event
of a dispute regarding the Distribution Plan, Luxe One's decision shall prevail.

**Benchmarks:**  Provided the Picture achieves or exceeds a mutually agreed upon per screen average to
be determined by the parties hereto in good faith prior to the initial release of the Picture on release week
#1 then Luxe One, Inc. ("LUXE") shall continue to sustain and expand the theatrical release with a
combined P&A budget addition of up to an additional USD $12 million. All strategy details and costs
associated with the sustained and expanded theatrical release shall be subject to mutual approval by the
Parties.

**Territory:**  "Territory" means the United States territory, as defined more fully in the distribution
agreement(s) with the domestic distributor of the Picture..

**Credit**
**Facility:**

$8,250.000 The P&A Commitment set forth above for the initial theatrical release.
Such funds shall be applied solely towards payment of
P&A cost line items within the mutually pre-approved P&A budget and
disbursed in accordance with the mutually approved P&A plan and
drawdown schedule. and in payment of such other items as expressly set
forth in this agreement.

**Reserve:**  - Up to $12,000.000 Reserve for Continuing Prints and Advertising subject
to the Benchmark requirements set forth above.

**Interest:**  - 17.5% premium on the P&A spend for the first year, 17.5% annual
simple interest thereafter.

**Drawdown**
**Deductions:**  Interest Reserve calculated at 15%

**Media Fee:**  A 5% administration & media fee (i.e., an amount equal to 5% of the P&A
spend) payable 2.5% to New Legacy Media Partners and 2.5% payable to
CinemaWest to administrate and monitor the advertising and marketing
costs.

250 Park Avenue                                          1800 Century Park East
Seventh Floor                                                  Sixth Floor
New York City, New York 10177                    Century City, CA  90067

Vuckovich 000850

THE LETTERS                                                          Luxe One, Inc.

**Reserve:**    $50,000    - Due Diligence Reserve for Legal, 3rd party Test Screening, Focus
Groups, & Revenue Forecasting shall be disbursed in accordance to
mutually approved third party(s) with any unused funds being deposited
with Lender's legal counsel for further use (at end of term any unused
funds shall be used to pay off loan balance).

**Collection Agent:**    Territorial gross proceeds, all media, shall be paid to a mutually approved
Collection Agent for disbursement (JP Morgan/Chase, Freeway and Fintage House are hereby pre-
approved).

**Collateral:**    First priority UCC1 security interest in all Territorial Picture (North American)
copyrights, all revenues, all media, from exploitation of the Picture (customary exclusions for guild
residuals, domestic distributor and lab liens if any allowed) with no other lien or encumbrance except
those pre-approved by Lender. Lender agrees to enter into customary and reasonable interparty
agreement with the domestic distributor of the Picture with regards to customary subordination of
distributor security interest.

**Sequels:**    LUXE or their designee shall have a First Option to provide the same Prints and
Advertising Lending Service on any and all related Sequels, Remakes and Television or Internet Spin
Offs as owned or controlled by the Borrower.

**Domestic Service
Distributor:**    Domestic Theatrical, Domestic Home Video &/or DVD, Domestic TV deals, are
required by Lender. Sony, MGM, Fox, Buena Vista Studios, Warner Brothers, Universal, Paramount,
LionsGate, Samuel Goldwyn, Relativity, Open Road, and the Weinstein Company are hereby pre-
approvable subject to the Distribution Terms and Conditions.

**Distribution Fee:** The Domestic Service Distributor shall be entitled to a non-deferred Theatrical
Distribution Fee not greater than 12.5% of 100% of Gross Theatrical Rentals in a priority position in front
of the Lender. The Parties shall negotiate and mutually approve the Service Distributor's DVD & TV
Fees in good faith. The Domestic Service Distribution Fees shall be deducted and retained by the
Domestic Service Distributor from gross receipts actually received by such distributor.

**Recoupment/Revenue Share:** Subject to LUXE's fulfillment of the obligations contemplated hereunder,
LUXE shall initially receive 100% of all gross receipts actually received from distributors or sales agents
(if any) from all media throughout the universe in perpetuity derived from the exploitation of the Picture
("Gross Revenue") until recoupment by Lender of: (i) $1,750,000 in finishing funds actually funded to
Borrower, plus (ii) 17.5% simple interest on the $1,750,000 Finishing Funds Advance accruing upon
payment of each installment, until fully recouped. Then, LUXE shall receive 90% of all Gross Revenue
and Borrower shall receive 10% of all Gross Revenue, until LUXE has fully recouped all Prints and
Advertising Funds and Interest advanced ("LUXE Recoupment"). Upon reaching LUXE Recoupment,
Borrower shall receive 70% of all Gross Revenue, and LUXE shall receive 30% of all Gross Revenue, in
perpetuity.

250 Park Avenue                                                    1800 Century Park East
Seventh Floor                                                             Sixth Floor
New York City, New York 10177                          Century City, CA 90067

THE LETTERS                                                                                Luxe One, Inc.

**Credit(s) and Fee:** Lender shall receive One Executive Producer Credit in total on-screen, and in the billing block of paid advertising in the Territory; plus a credit in the end crawl in the form "Prints and Advertising Financing through Luxe One, Inc." or its designee whenever the Picture is played in the Territory.

**Maturity Date**: 36 months from draw down.

**Audit Rights**:      Upon forty-five (45) days advance written notice and at its sole cost and expense, Borrower shall the right to inspect the financial books and records of Lender in order to verify the accuracy of any reporting statements delivered by Lender hereunder. Any inspection must be conducted during reasonable business hours at the offices where such books and records are kept, using a firm of certified public accountants with experience in the entertainment industry and be conducted in such manner as not to interfere with Lender's normal business activities, in order to verify all data reported by Lender to Borrower. Inspections shall take place not more often than once annually.

**Approval:**  Lender shall have reasonable approval over all territorial distribution agreements made by the Domestic Service Distributor, the P&A plan, Marketing plan, drawdown, spend and administration. Lender and Borrower agree that in the event Lender does not give its approval of any of the foregoing items, and further negotiations with such Domestic Service Distributor (or replacement domestic distributors) have ceased, Borrower may proceed to find alternative sources of P&A financing.

**Documentation and Conditions Precedent:** The initial P & A Commitment funding will be subject to satisfaction of the conditions precedent deemed reasonably appropriate and customary in the motion picture business in Los Angeles, CA for loan agreements of this type by the Lender to be set forth in the Loan Agreement, including, but not limited to those set forth below, and Lender shall provide standard and customary documentation for financing of this nature, including but not limited to:

a)  Executed loan agreement between Lender and Borrower.

b)  Executed security agreements in favor of the Lender.

c)      [intentionally deleted]

d)  A minimum of a Domestic USA Theatrical / Domestic DVD, Domestic TV agreement.  Mutually approved Service Distributors Term Sheet is sufficient.

e) Ownership, legal status and tax status of Borrower acceptable to Lender.

f)  Establishment of a mutually approved collection account.

g) Approval of chain of title for the Picture by Lender's counsel.

h)Approval of an overall Marketing Plan and Line Item Budget

i) Approval of the Distribution Plan

250 Park Avenue                                                          1800 Century Park East
Seventh Floor                                                                    Sixth Floor
New York City, New York 10177                                Century City, CA  90067

Vuckovich 000852

THE LETTERS                                                                    Luxe One, Inc.

j) A successful recruited test screening to the target demographic as performed by OTX with a number score of not less than 70 in the top two boxes.

k) Approval by Lender from Borrower of a customary copyright report and title report.

l) E&O insurance policy with limits of $5 million/$8 million with a deductible of no more than $25,000 listing Lender &/or their assigns named as additional insured &/or loss payee.

m) An MPAA rating no more restrictive than "PG-13".

**Confidentiality:** Without the prior written consent of Lender, neither this agreement nor any of the terms hereof may be delivered or disclosed to any third party, other than any legal counsel, accountants or financial advisors acting for the Borrower and/or the Borrower's investors.

**Arbitration and Jurisdiction:**  This Agreement shall be interpreted in accordance with the laws of the State of California, applicable to agreements executed and to be wholly performed therein.  Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration in accordance with the rules and procedures of the American Arbitration Association under its jurisdiction in Los Angeles before a single arbitrator familiar with entertainment law.  The parties shall have the right to engage in pre-hearing discovery in connection with such arbitration proceedings.  The parties agree hereto that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable attorney's fees and costs.  The arbitration will be held in Los Angeles and any award shall be final, binding and non-appealable.  The Parties agree to accept service of process in accordance with the AAA Rules.

**Execution:** This agreement, and any future amendments to this agreement, may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  A facsimile signature of a party shall be binding on such party to the same extent as an original signature. If this agreement, or any future amendment to this agreement, is signed by the parties or a party and delivered by means of facsimile transmission, the

Parties agree promptly to thereafter exchange original, executed counterparts thereof, but failure to do so shall not affect the validity, enforceability or binding effect thereof.

This Agreement shall be deemed to be a binding agreement and any omitted provisions shall be deemed to be in accordance with standard motion picture custom and usage. All notices hereunder shall be given by addressing them as indicated above, or to such address as the receiving party shall have theretofore specified in writing, and by depositing them as certified or registered mail, return receipt requested, postage prepaid, or by delivering them toll prepaid to a telegraph or cable company to a national overnight courier service or by telex or telecopy, receipt confirmed.

**IN WITNESS WHEREOF,** the Borrower and the Lender have executed this proposed summary of terms as of this 19th Day of September 2013.

**BORROWER**                              **LENDER**

250 Park Avenue                                                   1800 Century Park East
Seventh Floor                                                              Sixth Floor
New York City, New York 10177                          Century City, CA  90067

Vuckovich 000853

THE LETTERS

Big Screen Partners V, Ltd.          Luxe One, Inc.                    Luxe One, Inc.

By: _____          By: _____

Print Name: WiLLiAM C. Ri'ead        Print Name: James David Williams

Title: Owner of general partner,     Title: President
Ri'ead Productions Corporation              Luxe One, Inc.


250 Park Avenue                      1800 Century Park East
Seventh Floor                        Sixth Floor
New York City, New York 10177        Century City, CA 90067

Vuckovich 000854



Keep this receipt as a record of your purchase.

FOR YOUR PROTECTION SAVE THIS COPY

**CASHIER'S CHECK**

**Customer Copy**

1114324787

11/04/2013

California

**Remitter** STEVEN J BROWN

**Pay To The Order Of** COLLINS, BARIGONE & VUCKOVICH

$ *******50,000.00 ***

Drawer: **JPMORGAN CHASE BANK, N.A.**

NON NEGOTIABLE

Memo:_____
Note: For information only. Comment has no effect on bank's payment.

<u>TERMS</u>

KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION.
PLEASE CONTACT CHASE TO REPORT A LOSS OR FOR ANY OTHER INFORMATION ABOUT THIS ITEM.

Vuckovich 000959



**DEPOSIT TICKET**
DEPOSIT RECORD COPY

BANK LEUMI USA®
100 North LaSalle St., Chicago, IL 60602
Member FDIC

DATE 11-13-13

| | | CURRENCY | | | | | | | | | | | | | | | | | DOLLARS | CENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

2202/710

TOTAL ITEMS 1

**PLEASE BE SURE ALL ITEMS ARE PROPERLY ENDORSED.**
DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL.

$ 5000000

**COLLINS & BARGIONE**
**LAWYERS TRUST FUND OF ILL.**
1 N LASALLE ST., STE. 300
CHICAGO, IL 60602-3908

⑈0740020240⑈      70⑉      20

CHECKS AND OTHER ITEMS ARE RECEIVED FOR DEPOSIT SUBJECT TO THE PROVISIONS OF THE UNIFORM COMMERCIAL CODE OR ANY APPLICABLE COLLECTION AGREEMENT

Vuckovich 000960



**DEPOSIT TICKET**
FOR CLEAR COPY, PRESS FIRMLY WITH BALLPOINT PEN.

DATE 12-4-13

$ Fifty $50000

**COLLINS & BARGIONE**
**LAWYERS TRUST FUND OF ILL.**
1 N LASALLE ST., STE. 300
CHICAGO, IL 60602-3908

⑈07100 2024⑈ 70 1⑈ 20

2202/710

TOTAL
ITEMS 1

PLEASE BE SURE ALL ITEMS ARE PROPERLY ENDORSED.

DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL.

50000.00

CHECKS AND OTHER ITEMS ARE RECEIVED FOR DEPOSIT SUBJECT TO THE PROVISIONS OF THE UNIFORM COMMERCIAL CODE OR ANY APPLICABLE COLLECTION AGREEMENT

---

282111107 NEW 01/08 8810004306

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**CASHIER'S CHECK**

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**CHASE**

1157221811   91-2
1221

Remitter   STEVEN J. BROWN   Date   11/25/2013

**Pay:**   FIFTY THOUSAND DOLLARS AND 00 CENTS

**Pay To The Order Of**   COLLINS BARIGONE AND VUCKOVICH   $ *******50,000.00 ***

Memo:_____
Note: For information only. Comment has no effect on bank's payment.

Drawer: **JPMORGAN CHASE BANK, N.A.**

*Michael Andrews*

Senior Vice President
JPMorgan Chase Bank, N.A.
Phoenix, AZ

⑈1157221811⑈ ⑈122100024⑈ 234⑈

Vuckovich 000962



**COLLINS & BARGIONE**
**LAWYERS TRUST FUND OF ILL.**
1 N LASALLE ST., STE. 300
CHICAGO, IL 60602-3908

⑆07100 2024⑆       70 ⑆       20

CHECKS AND OTHER ITEMS ARE RECEIVED FOR DEPOSIT SUBJECT TO THE PROVISIONS OF THE UNIFORM COMMERCIAL CODE OR ANY APPLICABLE COLLECTION AGREEMENT.

282111107 NEW 01/08 8810004306

**CHASE**            **CASHIER'S CHECK**            HOLD DOCUMENT. UP TO THE LIGHT TO VIEW TRUE WATERMARK

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**1114325647**    91-2
                   1221

Date   01/06/2014   Void after 7 years

**Remitter:**   LUXE ONE INC.

**Pay To The**
**Order Of:**   COLLINS BARIGONE VUCKOVICH

**Pay:**   THIRTY EIGHT THOUSAND
           DOLLARS AND 00 CENTS                            $** 38,000.00 **

Do not write outside this box

**Drawer:  JPMORGAN CHASE BANK, N.A.**

*Michael Andrews*

Memo:_____
Note: For information only. Comment has no effect on bank's payment.

Senior Vice President
JPMorgan Chase Bank, N.A.
Phoenix, AZ

Security
Features
Details on
Back

⑈1114325647⑈ ⑆122100024⑆        234⑈

Vuckovich 000963



COLLINS & BARGIONE
LAWYERS TRUST FUND OF ILL.
1 N LASALLE ST., STE. 300
CHICAGO, IL 60602-3908





COLLINS & BARGIONE
LAWYERS TRUST FUND OF ILL.
1 N LASALLE ST., STE. 300
CHICAGO, IL 60602-3908



Vuckovich 000967

# EXHIBIT D



| Account Number | 234 | OF6 | 0 |
| --- | --- | --- | --- |
| Amount | $50,000.00 | Trans | 0 |
| Post Date | 20131113 | Routing Number | 122100024 |
| Sequence | 12467669 | Serial | 1114324787 |

