# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| BILL A. BUSBICE, JR., et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> ADRIAN VUCKOVICH, et al., ) <br> ) <br> Defendants. ) | No. 17-cv-01640 <br><br> Judge Andrea R. Wood |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Bill A. Busbice, Jr., Ollawood Productions, LLC ("Ollawood"), and Ecibsub, LLC ("Ecibsub") have sued Defendants Adrian Vuckovich and the law firm of Collins, Bargione & Vuckovich ("CBV") alleging that those Defendants conspired with others to defraud Plaintiffs, aided and abetted a fraud perpetrated against Plaintiffs, and were negligent and breached their fiduciary duties in connection with their legal representation of another entity, Luxe One, Inc. ("Luxe One"). Now before the Court are the parties' cross-motions for summary judgment (Dkt. Nos. 126, 143, 145), as well as Plaintiffs' motions asking the Court to take judicial notice of certain documents and facts related to the criminal proceedings against Defendants' purported co-conspirators (Dkt. No. 131) and to strike portions of Defendants' submissions in support of their motion for summary judgment (Dkt. No. 161, 170). This opinion addresses the portions of those motions directed toward Plaintiffs' civil conspiracy and aiding and abetting claims. For the reasons explained below, neither side is entitled to summary judgment on those claims.

## BACKGROUND

In April 2013, Gerald Seppala approached Busbice regarding an opportunity to invest in the film "Made in America" and introduced him to James David Williams. (Defs.' Resp. to Pls.'

Local R. 56.1(a)(3) Stmt. of Material Facts for Summ. J. No. 1 ("DRPSOMF 1") ¶ 7, Dkt. No. 164.) The investment was accomplished through the purchase of membership units in Visions, LLC, the film's project management, development, and financing entity. (*Id.* ¶ 8.) Williams promised to invest $500,000 of his own money if Busbice committed to investing the same amount; Seppala and Williams then provided various documents purporting to confirm the transfer of funds by Williams for the deal. (*Id.* ¶¶ 9, 11, 12.)[1] In reality, however, Williams did not transfer any funds. (*Id.* ¶ 14.)[2] None the wiser, on April 26, 2013, Busbice wired $500,000 in investment funds through Ecibsub[3] in reliance on the representation that Williams had already wired his funds. (*Id.* ¶ 13.)

That same day, $450,000 of the funds wired by Busbice were transferred to an account held in the name of Legacy Film Crest, LLC ("Legacy Account"). (*Id.* ¶ 15.) Williams then withdrew $112,525 in the form of cashier's checks from the Legacy Account, including checks for $37,500 payable to Steven J. Brown and $50,000 payable to the Noble Group. (*Id.* ¶ 16.) The

---

[1] In their response to Plaintiffs' statement of material facts, Defendants object to the evidence cited in support of these facts as inadmissible hearsay and lacking foundation. But evidence relied upon for summary judgment need not be admissible in its present form so long as the underlying facts can later be presented in admissible form. *See Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014); *see also Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008). Plaintiffs here rely on Busbice's declaration and emails received by Plaintiffs, for which Plaintiffs likely would be able to lay foundation at trial. (*See, e.g.*, Decl. of Bill A. Busbice ¶¶ 7, 9, 10, Dkt. No. 123.) Moreover, the referenced emails are not offered for the truth of the matter asserted—rather, they are offered to show the effect the emails had on Busbice and to show why he proceeded with his investments. The contents of the e-mails are also potentially admissible as statements by Defendants' co-conspirators. *See* Fed. R. Evid. 801(d)(2)(E). Therefore, Defendants' objections are unavailing.

[2] For various instances when Plaintiffs rely on records of the subject transactions to support their assertions regarding the money trail, Defendants do not dispute the facts but nonetheless object to the underlying evidence as hearsay and lacking foundation. The Court rejects these objections, as Plaintiffs rely on, among other things, bank records for which Plaintiffs likely would be able to establish foundation at trial (*see, e.g.*, Decl. of Paul Gale ¶ 30, Dkt. No. 122) and which likely fall under the business-records exception to the hearsay rule. *See* Fed. R. Evid. 803(6).

[3] Busbice is the sole member of Ollawood and one of the members of Ecibsub. (DRPSOMF 1 ¶¶ 2, 3.)

checks to Brown and the Nobel Group were deposited into CBV's retainer account ("CBV Dowling Account"). (*Id.* ¶¶ 16, 18.) Vuckovich is a partner in CBV. (DRPSOMF 1 ¶ 5.) Vuckovich and CBV had a long-standing relationship with Brown and represented him in various matters. (Defs.' Resp. to Pls.' Local R. 56.1(a)(3) Stmt. of Material Facts for Summ. J. No. 2 ("DRPSOMF 2") ¶ 26, Dkt. No. 165.) According to Vuckovich, CBV considered the Noble Group and Brown to be the same. (DRPSOMF 1 ¶ 17.) Moreover, Vuckovich has testified that, in his opinion, some people prefer to conduct their financial affairs through a lawyer, rather than using their personal accounts, regardless of whether the funds concern legal matters. (*Id.* ¶ 35.)

On May 7, 2013, Williams withdrew another $50,000 from the Legacy Account in the form of a cashier's check payable to the Noble Group, which was then deposited in the CBV Dowling Account on May 29, 2013. (*Id.* ¶ 19.) On May 28, 2013, Vuckovich wrote a $75,000 check drawn on the CBV Dowling Account and payable to Stuart Manashil. (*Id.* ¶ 20.) And on June 24, 2013, Vuckovich wrote a $50,000 check from CBV Dowling Account that was then deposited into CBV's client trust account ("CBV Trust Account"). (*Id.* ¶ 21.) The same day, Vuckovich signed a $50,000 check from CBV Trust Account to Manashil. (*Id.*)

In June 2013, Williams approached Busbice regarding another investment opportunity—one that involved making a prints and advertising (or "P&A") loan for publicizing the film "The Letters" arranged through Luxe One. (*Id.* ¶ 22.) Busbice organized Ollawood, with himself as the sole member and manager, for the purpose of investing in Luxe One. (*Id.* ¶ 23.) Williams provided Busbice and his lawyer with the term sheet for the deal, which Williams signed on Luxe One's behalf. (*Id.* ¶ 24.) The term sheet reflected that Williams had already advanced $2,000,000 to Luxe One and had obtained a $6,000,000 payment from another investor. (*Id.*) Later, Williams provided further evidence of his and the other investor's deposits even though, in reality, no such

deposits had been made. (*Id.* ¶¶ 25–26.) On July 3, 2013, in reliance on those representations, Busbice wired $2,000,000 to an account associated with Luxe One ("Luxe One 2939 Account"). (*Id.* ¶ 26.)

On July 12, 2013, Williams withdrew $100,000 from the Luxe One 2939 Account in the form of a cashier's check payable to the Noble Group. (*Id.* ¶ 27.) Vuckovich then attempted to deposit that check into the CBV Trust Account, purportedly out of convenience. (*Id.* ¶ 29.) And on July 23, 2013, he succeeded in depositing the check into a personal checking account that he held jointly with his wife, writing "Attorney" on the deposit slip next to his name. (*Id.* ¶ 28.) Two days later, Vuckovich issued from his personal account a $12,000 cashier's check payable to Associated Bank, which according to Vuckovich was urgently needed by Brown and his brother to complete the refinancing of a house. (*Id.* ¶¶ 30, 31.) On July 29, 2013, Vuckovich caused three checks to be issued totaling $100,000: a cashier's check for $88,000 from his personal account payable to Manashil, a check for $2,500 from CBV's operating business account payable to Manashil, and a check for $9,500 from the CBV Trust Account also payable to Manashil. (*Id.* ¶ 33.) Vuckovich has testified that he did what he was asked to do—not necessarily what he wanted to do—regarding the handling of those checks. (*Id.* ¶ 34.)

In October 2013, Williams approached Busbice regarding yet another investment opportunity—this time, a P&A loan for the film "Angels Sing." (*Id.* ¶ 36.) Busbice's attorney requested confirmation that Williams had deposited his own funds for the deal and received an e-mail from Williams's attorney with a bank statement reflecting the deposit. (*Id.* ¶ 40.) But again, the deposit had never actually taken place. (*Id.* ¶ 41.) On October 30, 2013, in reliance on the representation that Williams had already invested his own funds, Busbice wired $2,000,000 from Ollawood to an account associated with the deal ("Moment Factory Account"). (*Id.*) On

November 1, 2013, $50,000 was transferred from the Moment Factory Account to an account for Luxe One ("Luxe One 1572 Account"). (*Id.* ¶ 42.) Three days later, Brown wrote a cashier's check from the Luxe One 1572 Account in the amount of $50,000 and payable to CBV; that check was then deposited into the CBV Trust Account on November 13, 2013. (*Id.* ¶ 43.) On November 25, 2013, another $50,000 was transferred from the Moment Factory Account to the Luxe One 1572 Account. That same day, a cashier's check in the amount of $50,000 payable to CBV was drawn on the Luxe One 1572 Account; the check was deposited into the CBV Trust Account on December 4, 2013. (*Id.* ¶ 44.)

In November 2013, Williams presented Busbice with an opportunity to make further investments relating to "The Letters." (*Id.* ¶ 45.)[4] Busbice's attorney then requested confirmation that other investors had contributed to the deal and proof of the aggregate funding sum; Williams and his attorney provided supporting documents in response. (*Id.* ¶¶ 48, 49.)[5] On January 2, 2014, Busbice wired $4,000,000 through Ollawood to the Luxe One 2939 Account. (*Id.* ¶ 50.) The next day, $50,000 was transferred from the Luxe One 2939 Account to the Luxe One 1572 Account. (*Id.* ¶ 51.) On January 6, 2014, a $38,000 cashier's check payable to CBV was drawn on the Luxe One 1572 Account; the check was then deposited into the CBV Trust Account on January 9, 2014. (*Id.* ¶ 52.) On February 3, 2014, a $138,000 check payable to Manashil was issued from the CBV Trust Account. (*Id.* ¶ 53.)

---

[4] Defendants again do not dispute the facts but object to the underlying evidence as hearsay and lacking foundation. The objections are not well-founded—the statements are supported by Busbice's declaration and, in any case, the out-of-court statements are not offered for the truth of the matter asserted but rather to show the effect on Busbice and why he proceeded with his investments.

[5] Yet again, Defendants object to the cited evidence as hearsay and lacking foundation. But Plaintiffs rely on the declaration of an attorney who represented Busbice in the deal and emails and banking records sent to that attorney. (*See, e.g.*, Decl. of Michael D. Friedman ¶¶ 5–7, Dkt. No. 124.) Moreover, the underlying emails are not offered for the truth of the matter asserted—rather, they are used to show the effect on Busbice and his attorney and why they proceeded with the investments.

On January 27, 2014, Brown caused a $75,000 cashier's check to be issued from the Luxe One 1572 Account payable to CBV; the check was deposited into the CBV Trust Account on February 3, 2014. (*Id.* ¶ 54.) On April 11, 2014, $25,000 was transferred from the Moment Factory Account to the Luxe One 1572 Account. (*Id.* ¶ 55.) Three days later, Brown caused a $25,000 cashier's check payable to CBV to be drawn on the Luxe One 1572 Account; the check was deposited into the CBV Trust Account on April 24, 2014. (*Id.* ¶ 56.)

For all the above-described deals, Busbice was represented by counsel. (*Id.* ¶¶ 10, 23, 38, 47.) That counsel conducted some due diligence on the deals. (Pls.' Local R. 56.1(b)(3)(B) Resp. to Defs.' Local R. 56.1(a)(3) Stmt. of Material Facts ("PRDSOMF") ¶¶ 7–12, Dkt. No. 151.) In May 2014, Busbice learned that the investment opportunities were shams and demanded that his funds be returned to no avail. On April 23, 2014, the Luxe One 1572 Account, the Luxe One 2939 Account, and the Moment Factory Account were frozen by the bank holding those accounts. (DRPSOMF 1 ¶¶ 58, 59.)[6]

In June 2014, CBV began representing Brown, Seppala, Williams, Legacy, and Luxe One in a lawsuit filed against them by Busbice, *Busbice, et al. v. Williams, et al.*, No. 2:14-cv-4077-PA-AJW (C.D. Cal.) ("*Busbice I*"). (*Id.* ¶ 60.) By June 3, 2014, Vuckovich received the *Busbice I* complaint, which alleged that Brown, Williams, and Seppala defrauded Busbice through the intentional falsification of financial documents, lies, and material misrepresentations. (*Id.*) Around June 2014, CBV also had some involvement on behalf of Luxe One in an arbitration against Big Screen Partners V, Ltd., which alleged that Williams had comingled and misappropriated funds of Luxe One and other entities. (*Id.* ¶ 61.) Around July 3, 2014, Vuckovich received a letter

---

[6] Defendants object to the evidence cited by Plaintiffs as hearsay and lacking foundation. But Plaintiffs rely on Busbice's declaration, an opinion from Plaintiffs' expert, and underlying bank records, for which Plaintiffs should be able to lay a foundation at trial and which potentially fall under the business records exception to the hearsay rule. (*See, e.g.*, Decl. of Paul L. Gale ¶¶ 30, 31, 33, 35, 37, 42, 43, 48; Decl. of Michael D. Friedman ¶ 8.) The Court finds this support sufficient for present purposes.

addressed to Williams from an attorney representing Left Behind Investments—the producer of the film "Left Behind" in which Busbice had invested—alleging that Williams committed fraud. (*Id.* ¶ 62.)

In August 2014, Vuckovich executed documents to transfer ownership of a condominium located in California to a newly-formed entity for which Vuckovich was the sole manager and Astrid Montgomery, Brown's fiancée, was the sole member. (*Id.* ¶¶ 63, 64.) On August 26, 2014, a $100,000 check signed by Vuckovich and payable to Manashil was issued from the CBV Trust Account. That check purportedly related to the transfer of title for the condominium. (*Id.* ¶ 57.) Vuckovich later testified that some of the checks deposited through the CBV Trust Account and the CBV Dowling Account were for Brown's personal purchase of the condominium from Manashil and that the property was put in Montgomery's name as a symbolic gesture to show Montgomery's family that Brown was not interested in her money. (*Id.* ¶ 64.)

In 2017 and 2018, Williams, Seppala, Manashil, and Brown pleaded guilty to various criminal charges relating to the film investments described above. (*Id.* ¶¶ 65–69.)[7] In the present civil case, Plaintiffs now seek to hold Vuckovich and CBV accountable for their alleged involvement in the fraud. In their Second Amended Complaint, Plaintiffs assert claims against Defendants for an alleged civil conspiracy to defraud Plaintiffs and to convert and fraudulently transfer Plaintiffs' investment funds (Count I), the purported aiding and abetting of those actions (Count II), imposition of a constructive trust for certain funds held by Defendants (Count III), negligence (Count IV), and breach of fiduciary duty (Count V).

---

[7] Defendants do not dispute that the guilty pleas were entered. As the Court does not need to rely on the facts underlying the pleas to decide the dispositive motions presently before it, Plaintiffs' motion to take judicial notice (Dkt. No. 131) is denied as moot.

**DISCUSSION**

Summary judgment is appropriate if the record, viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008). A genuine issue of material fact exists if a reasonable jury could find in favor of the nonmoving party. *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). "When, as here, cross-motions for summary judgment are filed, [the court] must look to the burden of proof that each party would bear on an issue of trial; [the court] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (citing *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)). Cross-motions also must be viewed separately in the sense that for each motion, factual inferences are viewed in the nonmovant's favor. *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015).

## I. Underlying Fraud

The Court begins by considering the purported fraud, which serves as the basis for both Plaintiffs' conspiracy and aiding and abetting claims. Under Illinois law, the elements of common law fraud are: (1) a false statement of material fact; (2) the defendant's knowledge that the statement was false; (3) the defendant's intent that the statement induce the plaintiff to act; (4) the plaintiff's reliance upon the truth of the statement; and (5) damages to the plaintiff resulting from the plaintiff's reliance on the statement. *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996).

Defendants argue that Plaintiffs cannot prove the reliance element of the underlying fraud because Plaintiffs relied not on the purportedly false statements by Defendants' co-conspirators but instead on the counsel who represented them in their investment transactions. But the fact that Plaintiffs were represented by counsel who conducted some due diligence for the deals does not foreclose the possibility that Plaintiffs reasonably relied on the purported false statements. Moreover, the record evidence that Defendants cite in support of their arguments does not support their assertion that Plaintiffs did not rely on the fraudulent statements—it simply indicates that Plaintiffs were represented by counsel and the counsel did some due diligence on the deals. (*See* PRDSOMF ¶¶ 6–12.) Despite Defendants' suggestion to the contrary, the record contains sufficient support for a reasonable jury to find that Plaintiffs relied on the purportedly false statements even though they were represented by counsel, as Busbice describes various representations made by Defendants' purported co-conspirators and how he relied on those statements. (*See, e.g.*, Decl. of Bill A. Busbice ¶¶ 7–11, 13–15, 17–20, 22–24, Dkt. No. 155.)

## II. Conspiracy

Having established that Plaintiffs have adduced sufficient evidence of an underlying fraud, the Court next turns to the remaining requirements for Plaintiffs' conspiracy claim. To succeed on a civil conspiracy claim under Illinois law, a plaintiff must establish the existence of an agreement between persons for the purpose of accomplishing an unlawful purpose (or a lawful purpose by unlawful means) and at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff. *See McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). The agreement is an important and necessary element of a civil conspiracy claim. *Id*. Civil conspiracy is an intentional tort. As such, the defendants must have knowingly and voluntarily participated in a scheme. Accidental, inadvertent, or negligent

participation is not enough. *Id.* Nor is mere knowledge of the fraudulent or illegal actions. *Id.* Moreover, innocent performance of acts that fortuitously further the tortious purpose of another is not enough to show participation in a civil conspiracy. *Id.* But defendants who understand the general objectives of a scheme, accept the objectives, and agree implicitly or explicitly to do their part to further those objectives may be held liable. *Id.*

Here, Defendants argue that the purported false statements upon which Plaintiffs claim to have relied had nothing to do with Defendants or their bank accounts. In making this argument, however, Defendants misconstrue the nature of Plaintiffs' conspiracy claim. "The civil conspiracy theory [of liability] has the effect of extending liability for a tortious act beyond the active tortfeasor to individuals who have not acted but have only planned, assisted, or encouraged the act." *McClure*, 720 N.E.2d at 258. Thus, to hold Defendants responsible under a theory of civil conspiracy, it is not necessary for Plaintiffs to show that they relied on Defendants' own statements or that the underlying fraudulent statements concerned Defendants themselves or their banking accounts. Rather, Plaintiffs need only show that Defendants "planned, assisted, or encouraged" a fraud committed by others.

Defendants further contend there is no evidence they agreed to work for the purpose of defrauding Plaintiffs, as they did not even know Plaintiffs until *Busbice I* was filed[8] and thus

---

[8] In support of their summary judgment motion, Defendants filed a statement of material facts in which they assert, without citation to record evidence, that Vuckovich had no knowledge of Busbice until *Busbice I* was filed. (*See* PRDSOMF ¶ 19.) When Plaintiffs moved to strike that portion of the statement, Defendants responded by citing Vuckovich's testimony as well as Busbice's testimony that he had no knowledge of Vuckovich. (Defs.' Resp. to Pls.' Mot. to Strike at 5, Dkt. No. 173.) But Vuckovich's testimony does not support the assertion that Vuckovich did not know Busbice; it simply discusses the timing of Vuckovich's receipt of the *Busbice I* complaint and that Vuckovich did not do much investigating of the underlying facts. (*See* Ex. 4 at 83–86, 105–106, Dkt. No. 141-4.) Even if Vuckovich were to testify that he did not know Busbice until *Busbice I* was filed, a reasonable jury could find Vuckovich's testimony to lack credibility in light of the multitude of transactions in which he was involved and other record evidence. This Court further notes that it has not relied on statements that are the subject of Plaintiffs' motion to strike in reaching its decision here.

10

could not have agreed to defraud them. But conspiracies are secretive by nature and thus almost never susceptible to direct proof. *See id.* Instead, conspiracies are most often established by circumstantial evidence, inferences drawn from such evidence, and common-sense knowledge of behavior of individuals in similar situations. *See id.* In the present case, while Plaintiffs have not adduced direct proof that Defendants agreed to defraud Plaintiffs, they have put forward enough circumstantial evidence for a reasonable jury to find that such an agreement existed. As described above, Defendants received and issued multiple checks that helped to convert Busbice's investments into checks to Manashil. Not only were various CBV accounts involved, but Vuckovich also tapped into his personal account when an attempted deposit to CBV's account did not work. Furthermore, a reasonable jury could conclude that the financial transactions did not stop even after Vuckovich had notice that something fishy was going on with his clients. The record also suggests that Vuckovich had a close relationship with at least some of the participants of the underlying scheme. *Cf. Terrell v. Childers*, 920 F. Supp. 854, 866 (N.D. Ill. 1996) (denying defendants' motion for summary judgment because a reasonable factfinder could infer conspiratorial agreement from, *inter alia*, the defendant's intimate relationship with other defendants regarding the plaintiffs' financial affairs). Therefore, Defendants' argument that they are entitled to summary judgment on the conspiracy claim because Plaintiffs cannot show a genuine dispute of material fact fails.

Plaintiffs, however, seek not just to prevent the imposition of summary judgment against them on their conspiracy claim but also to obtain summary judgment in their favor. They contend that a reasonable jury would be compelled to conclude that a conspiratorial agreement existed due to the undisputed evidence of Defendants' banking deposits and withdrawals, the lack of sensible explanations for such transactions, and the fact that such deposits and withdrawals created

11

needless transactional complications. Under Plaintiffs' view, Defendants were, at best, deliberately avoiding knowledge of the illegal nature of the scheme. *See Terrell*, 920 F. Supp. at 866 (noting that "[the defendant] cannot escape liability for mail and wire fraud schemes by deliberately avoiding knowledge of the illegal nature of the schemes") (citing *United States v. Diaz*, 864 F.2d 544, 549–50 (7th Cir. 1988)). However, when viewed in the light most favorable to Defendants, the record raises genuine issues of material fact regarding whether Defendants agreed to defraud Plaintiffs or fraudulently to transfer their funds, as well as whether and to what extent Defendants understood the general objectives of the purported scheme (at least prior to the filing of *Busbice I*) and accepted those objectives. As a result, Plaintiffs are not entitled to summary judgment in their favor on the conspiracy claim.

### III. Aiding and Abetting

The Court next examines Plaintiffs' aiding and abetting claim. In Illinois, a claim for aiding and abetting another tortfeasor's conduct must satisfy the following elements: (1) the aided party must perform a wrongful act that causes an injury, (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time he provides the assistance, and (3) the defendant must knowingly and substantially assist the principal violation. *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003); *see also Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006).

Defendants argue that Plaintiffs' evidence is insufficient to show that they knew about the scheme to defraud Plaintiffs and thus they could not have been regularly aware of their role or knowingly assisted the principal violation. But, as discussed above, when viewed in the light most favorable to Plaintiffs, there is enough evidence for a reasonable jury to conclude that Defendants had the required knowledge and knowingly assisted in transferring fraudulently obtained funds.

Also as discussed above, issues of material facts exist as to what and when Defendants knew about the underlying scheme. Thus, summary judgment is not appropriate in favor of either Defendants or Plaintiffs on the aiding and abetting claim.[9]

## CONCLUSION

For the reasons discussed above, Plaintiffs' motion for summary judgment on their claims for civil conspiracy and aiding and abetting (Dkt. No. 143) is denied. In addition, Defendants' motion for summary judgment (Dkt. No. 126) is denied with respect to Plaintiffs' conspiracy and aiding and abetting claims, with the remainder of Defendants' motion taken under advisement for ruling by separate order along with Plaintiffs' motion for summary judgment on their claims for negligence and breach of fiduciary duty (Dkt. No. 145).

ENTERED:

Dated: November 30, 2018

Andrea R. Wood
United States District Judge

---

[9] Defendants' motion to dismiss Plaintiffs' conspiracy and aiding and abetting claims pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 51) is also denied. When this case was transferred to this District, the portion of Defendants' motion to dismiss directed toward the adequacy of the pleading of Plaintiffs' conspiracy and aiding and abetting claims remained pending. In the interest of clarity and completeness, the Court expressly finds that Plaintiffs' Second Amended Complaint contains sufficient allegations, when viewed in the light most favorable to Plaintiffs, to meet even the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Specifically, the Second Amended Complaint alleges who participated in the underlying fraud and larger conspiracy, how the scheme was carried out, where it took place, and what Defendants did to aid and abet the scheme. (*See, e.g.,* Second Am. Compl. ¶¶ 1–5, 8, 26–33, 37–41, Dkt. No. 21.)